Edwin PARKER and Mary Parker,
H/W, Appellants

v.

Howard S. FREILICH, M.D., Northeast
Gastroenterology Associates, Inc., and
Robert Shaw, C.R.N.A., Appellees

Superior Court of Pennsylvania.

Submitted Oct. 2, 2001.
Filed June 17, 2002.
Reargument Denied Aug. 20, 2002.

Kyle N. Thompson, Plymouth Meeting, for appellee.

Before MCEWEN, P.J.E., JOYCE and KELLY, JJ.

JOYCE, J.

¶ 1 Appellant,[1] Mary Parker, appeals from the February 22, 2001 judgment[2] of the Court of Common Pleas of Philadelphia County which was entered following the denial of Appellant's motion for post trial relief.[3] For reasons set forth

---

1. Although we refer to Mary Parker as the Appellant, we note that Edwin Parker, Mary's husband, is also an Appellant in this appeal. Edwin's case, premised on loss of society, services, and companionship, is purely derivative.

2. Appellant purportedly appeals from the February 22, 2001 **order**. We note that an order denying post-trial motions is not appealable until the order is reduced to judgment. *See Yon v. Yarus*, 700 A.2d 545, 546 (Pa.Super.1997). The appeal in this case properly lies from the judgment entered on February 22, 2001, and **not** the **order** issued on the same date.

3. Although Appellant appeals from the denial of her motions for post trial relief, her contentions relate to the trial court's refusal to remove the nonsuit entered in favor of Appellees, Howard S. Freilich, and Northeast Gastroenterology Associates, Inc. as well as the court's failure to instruct the jury on ostensible agency theory.

herein, we reverse and remand for proceedings consistent with this opinion.

¶ 2 Appellant, Mary Parker entered into a physician-patient relationship with Howard S. Freilich, M.D., in 1997. Appellant had several office visits with Dr. Freilich. During one of the visits, Dr. Freilich performed a sigmoidoscopy on Appellant, which detected a polyp. Dr. Freilich discussed this finding with Appellant. Following the discussions, Appellant agreed to undergo a procedure known as a colonoscopy to further evaluate the significance of the polyp. Dr. Freilich indicated he would perform the procedure in his office rather than in a hospital. He explained to Appellant that performing such a procedure in a doctor's office is an acceptable practice, that he has the facilities necessary for this procedure in his office, and that his facilities were equivalent to hospital facilities.

¶ 3 On January 13, 1998, Appellant visited Dr. Freilich's office to undergo the scheduled colonoscopy procedure. To aid in this procedure, Dr. Freilich engaged the services of a registered nurse anesthetist, Mr. Robert Shaw, who, unbeknownst to Appellant, was an independent contractor, and not Dr. Freilich's employee. Before the procedure began, Appellant completed and signed a health history form, which had the following letterhead on the top of the first page:

ANESTHESIA ASSOCIATES

Ronald Burkitt, CRNA

2075 Eagle Way

Hatfield, PA, 19440

215–723–9281

Exhibit D, Motion for Summary Judgment of Defendant, Howard Freilich, M.D. and Northeast Gastroenterology Associates, Inc. Appellant also completed and signed an anesthesia consent form, which contained the following letterhead:

R & P Anesthesia Associates.

2075 Eagle Way

Hatfield, PA, 19440

215–723–9281

*Id.*

¶ 4 Appellant had a brief conversation with Nurse Shaw but was not informed that Nurse Shaw was Dr. Freilich's independent contractor rather than an employee. Shortly before the procedure began, Appellant was placed under "conscious sedation" through an intravenously delivered medication. The intravenous line was placed in Appellant's right forearm by the nurse, Robert Shaw. Nurse Shaw also placed a catheter on Appellant's right forearm.

¶ 5 Dr. Freilich subsequently performed the colonoscopy procedure on Appellant in the doctor's medical office. After the procedure, Dr. Freilich discharged Appellant and she went home the same day. While at home taking a shower, that evening, Appellant discovered a catheter on her right arm—the same catheter placed on her right arm by Nurse Shaw. Appellant showed the catheter to her husband and later removed it by herself without seeking any medical advice.

¶ 6 On July 30, 1998, Appellant commenced the instant action against nurse Shaw, Dr. Freilich, and his practice group (Northeast Gastroenterology Associates, Inc.) alleging among other things, that Nurse Shaw negligently failed to remove the catheter from her arm, that as a result, she suffered permanent injuries, and that Dr. Freilich should be held liable for Nurse Shaw's negligence based on the theory of ostensible agency. A default judgment was later entered against Nurse

Shaw.[4] On November 8, 2000, Appellees filed a motion for summary judgment alleging that Dr. Freilich was not directly negligent in this case; that Nurse Shaw was not Dr. Freilich's employee; and that the doctrine of ostensible agency is inapplicable to the present case. On December 14, 2000, Judge Arnold L. New granted the motion with respect to the direct negligence of Dr. Freilich but denied the motion in all other respects. No opinion was issued in support of this ruling.

¶ 7 A jury trial commenced on January 2, 2001 before Judge Victor J. DiNubile. At the close of Appellant's case, Appellees moved for the entry of nonsuit on several issues, including the issue of ostensible agency. The trial court ruled that ostensible agency was applicable only to hospitals and Health Maintenance Organizations (HMOs), but inapplicable to doctors. The court then granted Appellees' motion for nonsuit with regard to the issue of ostensible agency.[5] The trial proceeded with respect to the remaining issues.

¶ 8 Appellees then presented their case, and at the close of all evidence, Appellant requested that the jury be instructed on the doctrine of ostensible agency. The trial court denied this request, having previously granted nonsuit in favor of Appellees on this issue. The case was submitted to the jury with special interrogatories. On January 4, 2001, the jury returned a verdict reflecting the following answers to these interrogatories: "Was Robert Shaw, the nurse anesthetist, negligent? [Answer:] Yes. Was the negligence of Mr.

Shaw a substantial factor in bringing about any harm to plaintiff [Appellant], Mary Parker? [Answer:] Yes. Was Mr. Shaw the agent of Dr. Freilich? [Answer:] No." N.T. 1/4/2001, at 116. In light of the above answers, the jury proceeded no further—the verdict being in favor of Appellees, Dr. Freilich and Northeast Gastroenterology Associates, Inc. Appellant subsequently filed post-trial motions which were denied by the trial court on February 22, 2001. In the motions, Appellant sought judgment notwithstanding the verdict or, in the alternative, a new trial. On March 8, 2001, Appellant filed the instant appeal, raising the following issues:

a. Where defendants assert in a motion for summary judgment that the doctrine of ostensible or apparent agency cannot, as a matter of law, be applied to a physician or his practice so as to hold defendants liable for the negligence of an independent contractor working in the defendants' office, and that motion is denied, is a trial court thereafter free to accept defendants' argument, ignore the earlier ruling, and grant a directed verdict in favor in favor of the defendants?

b. Where plaintiff's treating gastroenterologist proposes to perform a surgical procedure in his office is not the physician liable, under the doctrine of ostensible or apparent agency, for the negligence of a nurse anesthetist hired by the doctor to render anesthesia services, even though the nurse is an independent contractor, where the patient looked to the doctor for the provision of proper

4. Despite the entry of default judgment, Nurse Shaw was permitted to continue his participation in the case for purposes of determination and calculation of damages, if necessary.

5. Although Appellant has not raised this issue, we question the propriety of the trial court's grant of nonsuit in favor of Appellees given the fact that Appellees presented evidence

(namely, the testimony of Dr. Stephen Gollomp, N.T. 1/3/2001, at 10 –15, as well as defense exhibits, D–1 through D–7, id. at 162) during Appellant's case in chief. See Pa. R.C.P. 230.1 (stating that a trial court may only enter a nonsuit "before any evidence on behalf of the defendant has been introduced").

medical care and where the doctor took no steps to correct the foreseeable misimpression that the nurse anesthetist was the employee of the doctor and [Appellant], in fact, reasonably believed the nurse anesthetist was the doctor's employee?

Brief for Appellant, at 5.

¶ 9 Our review of Appellant's claims will be guided by the following standards:

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict.... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case. Our review of the trial court's denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. In making this determination, we must consider whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed.

*Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 304–305 (Pa.Super.1999) (internal citations omitted).

With regard to the scope of review, our Court recently stated that:

The scope of review in deciding whether or not a trial court erred in not granting a new trial is broader than when we pass on whether or not a denial of judgment n.o.v. was an abuse of discretion. Here we must consider all of the evidence. Only when the verdict is so contrary to the evidence so as to shock one's sense of justice should a new trial be granted, however. We will not reverse the decision of the trial court in refusing to grant a new trial unless there has been a clear abuse of discretion or an error in law determinative to the outcome of the case.

*Price v. Chevrolet Motor Div. of General Motors Corp.*, 765 A.2d 800, 806–807 (Pa.Super.2000).

¶ 10 Because Appellant also challenges the propriety of the trial court's grant of a compulsory nonsuit, we note our well-settled standard and scope of review:

A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiffs' evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury. When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered.

A compulsory non-suit is proper only where the facts and circumstances com-

pel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.

*Hong v. Pelagatti,* 765 A.2d 1117, 1121 (Pa.Super.2000) (citations and quotation marks omitted).

¶ 11 In her first issue, Appellant claims that pursuant to the doctrine of "the law of the case," the trial court is bound by its ruling on the issue of ostensible agency when it denied Appellees' motion for summary judgment. According to Appellant, Appellees' motion for summary judgment argued that the doctrine of ostensible agency was inapplicable to physicians but was only applicable to Hospitals and HMO's. The denial of this motion, Appellant argues, precludes the trial court from granting Appellees' motion for nonsuit which also argued that the doctrine of ostensible agency was inapplicable to physicians but was only applicable to Hospitals and HMOs. Appellant's argument lacks merit. In *Riccio v. American Republic Ins. Co.,* 550 Pa. 254, 705 A.2d 422, 425 (1997), our Supreme Court set forth the following explanation of the coordinate jurisdiction rule:

This Court has long recognized that under the coordinate jurisdiction rule, judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions. *Commonwealth v. Starr,* 541 Pa. 564, 573, 664 A.2d 1326, 1331 (1995). The coordinate jurisdiction rule is premised on the sound jurisprudential policy of fostering finality in pretrial proceedings, thereby promoting judicial economy and efficiency. *Id.* This rule applies equally to civil and criminal cases and it falls within the "law of the case" doctrine.

*Id.* According to the Court, under the law of the case doctrine,

[a] court involved in the later phases of a litigated matter should not reopen

questions decided by another judge of the same court or by a higher court in the earlier phases of the matter. Among the related but distinct rules which make up the law of the case doctrine are that: ... upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

*Id.* (citation omitted).

¶ 12 In determining whether the coordinate jurisdiction rule applies, a court must consider the procedural posture of the case. As our Supreme Court succinctly stated:

Where the motions differ in kind, as preliminary objections differ from motions for judgment on the pleadings, which differ from motions for summary judgment, a judge ruling on a later motion is not precluded from granting relief although another judge has denied an earlier motion. However, a later motion should not be entertained or granted when a motion of the same kind has previously been denied, unless intervening changes in the facts or the law clearly warrant a new look at the question.

*Id.* (citations omitted).

¶ 13 In the case at bar, Judge New denied Appellees' pretrial motion for summary judgment. At trial, at the close of Appellant's case, Judge DiNubile granted Appellees' motion for nonsuit on the issue of ostensible agency. Since a motion for summary judgment and a motion for nonsuit are not motions of the same kind, Judge DiNubile did not violate the coordinate jurisdiction rule in granting the motion for nonsuit. Furthermore, at the time the nonsuit was granted, Judge DiNubile had before him the evidence presented by Appellant in her case in chief. By con-

trast, when Judge New denied the summary judgment motion, trial had not begun and Appellant had not presented her case in chief. Thus, Appellant's presentation of her case in chief constitutes an intervening change in the facts that warranted a second consideration of the issue of the applicability of the doctrine of ostensible agency through a motion for nonsuit—the earlier denial of the summary judgment motion notwithstanding. Also, the fact that no opinion was issued in support of the denial of the summary judgment motion is irrelevant. *See Riccio, supra*, at 425 (when determining whether the coordinate jurisdiction rule applies, the court is not guided by whether an opinion was issued in support of the initial ruling). Therefore, we hold that the trial court did not violate the coordinate jurisdiction rule in granting Appellees' motion for nonsuit and Appellant is not entitled to relief on that basis.

¶ 14 We now turn to Appellant's second contention in which she argues that the doctrine of ostensible agency is, or should be applicable to physicians in circumstances such as the one underlying this case. Initially, we note that this is an issue of first impression in this Commonwealth.

¶ 15 Restatement (Second) of Agency, Section 267, defines ostensible agency as follows: "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."

> Under the doctrine of ostensible agency, a hospital [or HMO] may be held liable for the negligent acts or omissions of an independent doctor. Pennsylvania courts have determined that the two factors relevant to a finding of ostensible agency are: (1) whether the patient looks to the institution, rather than the individual physician for care and (2) whether the hospital 'holds out' the physician as its employee.

*Goldberg ex rel. Goldberg v. Isdaner*, 780 A.2d 654, 660 (Pa.Super.2001)(internal citation omitted).

¶ 16 Pennsylvania courts first recognized the theory of ostensible agency with respect to hospitals and their independent contractor physicians in *Capan v. Divine Providence Hospital* 287 Pa.Super. 364, 430 A.2d 647 (1980). In that case the court held the theory applicable to hospitals when hospitals engage the services of physicians on an independent contractor basis. Similarly, the doctrine of ostensible agency was made applicable to HMOs in *Boyd v. Albert Einstein Medical Center*, 377 Pa.Super. 609, 547 A.2d 1229 (1988). Since *Capan* and *Boyd*, Pennsylvania courts have consistently held the theory of ostensible agency applicable to hospitals and HMOs. *See e.g. Goldberg ex rel. Goldberg v. Isdaner*, 780 A.2d 654, 660 (Pa.Super.2001); *McClellan v. HMO*, 413 Pa.Super. 128, 604 A.2d 1053, 1057 (1992); *Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703, 707 (1991). In the case at bar, we are asked, for the first time, to extend this theory to physicians.

¶ 17 We begin as did the Court in *Capan*, by noting that:

> As a general rule, an employer is not liable for torts committed by an independent contractor in his employ. We have, however, recognized an exception to the general rule, stated in section 429 of the Restatement (Second) of Torts, which provides that one who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are

being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

*Capan,* at 648 (citations omitted). The court in *Capan* also noted with approval, this Court's prior decision in *Ostrowski v. Crawford Door Sales Co.,* 207 Pa.Super. 424, 217 A.2d 758 (1966), where we held that:

section 429 [429 of the Restatement (Second) of Torts] authorized recovery against a door seller for injuries sustained by a third party as a result of negligent installation of the door by the seller's independent contractor. Several factors led us to conclude that the door installation was accepted in the reasonable belief that it was performed by the seller, including: the fact that the seller's contract required it to provide an installed door; the contract price included installation; and the buyer had no reason to believe that a third party was installing the door.

*Capan,* 430 A.2d at 649.

¶ 18 Based on the exception embodied in section 429 of the Restatement (Second) of Torts, and Restatement (Second) of Agency, Section 267, Pennsylvania courts formulated the doctrine of ostensible agency in situations where a plaintiff seeks to hold a hospital or HMO liable for the negligence of independent contractors engaged by the hospital or HMO. While Pennsylvania courts and courts of other jurisdictions have, to varying degrees, adopted the theory of ostensible agency with respect to hospitals and HMOs, we are unaware of any jurisdiction that has applied this theory to situations such as the one at issue in the present case. Appellant does not argue, and our research does not show that,

in other jurisdictions, a doctor who, in the course of performing a procedure, utilizes the services of an independent contractor, may be held liable for the negligence of the independent contractor under the theory of ostensible agency. On the other hand, we have not found any jurisdiction that specifically rejected the application of this theory in a circumstance similar to the one involved in this case. In the absence of any express adoption or rejection of this theory in circumstances such as the one involved in the case at bar, we turn to the rationale underlying the adoption and application of this theory to hospitals and HMOs.

¶ 19 In recognizing this theory, our Court observed that "the changing role of the hospital in society creates a likelihood that patients will look to the institution rather than the individual physician for care" (*Capan,* 430 A.2d at 649) and that "a patient today frequently enters the hospital seeking a wide range of hospital services rather than personal treatment by a particular physician." *Id.* We then concluded that "it would be absurd to require such a patient to be familiar with the law of *respondeat superior* and so to inquire of each person who treated him whether he is an employee of the hospital or an independent contractor." *Id.* We further stated that " 'ostensible agency' relationship between hospital and physician exists where the hospital 'holds out' the physician as its employee" (*Id.* at 649) and that "a holding out occurs when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees." *Id.* at 649.

¶ 20 Employing a similar rationale, in *Boyd, supra,* our Court made the theory of ostensible agency applicable to HMOs. *See Boyd,* 547 A.2d at 1232. We concluded that if two factors are present, although a

physician holds independent contractor status with respect to an HMO, he may nevertheless be an agent of the HMO with respect to the patient. The factors are: (1) whether the patient looks to the institution, rather than the individual physician for care, and (2) whether the HMO "holds out" the physician as its employee. *See id.* at 1234.

¶ 21 After reviewing the rationale employed in *Capan* and *Boyd,* we see no reason why the same line of reasoning should not be applicable to the instant case. The modern realities of the practice of medicine is that some physicians, without any affiliation to a hospital or HMO, maintain private offices in which they consult with patients and sometimes perform minor medical procedures. These doctors often have office employees who provide various forms of assistance to the doctors as well as to the patients. These employees perform services such as taking a patient's vital signs (checking the patient's temperature, blood pressure, etc.). In addition, some of these doctors often use the services of nurses on an independent contractor basis. In situations where the doctor performing the procedure on a patient in his office utilizes the services of an independent contractor nurse, it would be absurd to require such a patient to be familiar with the law of *respondeat superior* and so to inquire of each person who treated him whether he is an employee of the doctor or an independent contractor. *See Capan,* 430 A.2d at 649. A patient cannot be expected to quiz each and every assistant rendering services to the patient at the doctor's behest, to ascertain whether he or she is an employee or an independent contractor, and whether the doctor can be held liable for the assistant's negligence.

¶ 22 Besides, when a patient visits a doctor's office for medical attention or to undergo in-office medical procedures, the patient normally looks to the doctor for care. The patient does not normally visit a doctor's office seeking or expecting to be treated or cared for by the doctor's independent contractors. The patient looks to the doctor or the doctor's agents for care. Thus, under the present circumstances, holding doctors liable for the negligence of independent contractor nurses under the theory of ostensible agency is quite consistent with the rationale behind the application of this theory to hospitals and HMOs. Also, when a doctor undertakes to perform in his office, a medical procedure that is normally performed in a hospital, we see no reason why the doctor should not be liable to the same extent as a hospital for the harm suffered by a patient as a result of this procedure. In performing such a procedure in his office rather than a hospital, a doctor stands in the same position as a hospital for purposes of liability with respect to the doctor's employees and independent contractors. A doctor should not be absolved of liability for the negligence of his/her independent contractors simply because the procedure was performed in the doctor's office rather than a hospital. A patient who submits himself to the care of a doctor for the performance of an in-office medical procedure should be entitled to recover damages from the doctor for the negligence of the doctor's independent contractors just as a patient who submits himself to the care of a hospital is entitled to recover damages from the hospital for the negligence of the independent contractors utilized by the hospital under the theory of ostensible agency. It is not an undue burden to require doctors who use the services of independent contractors for the performance of in-office medical procedures, to expressly inform the patients of the independent contractor status of the assistant. The patients should

also be informed that the doctors are not liable for the negligence of the independent contractors. This information may affect a patient's decision to undergo the procedure in a doctor's office rather than a hospital; the information may also cause a patient to question the independent contractor regarding whether the independent contractor has professional liability insurance coverage. We see no logical, legal, or public policy reasons why doctors should not be required to provide this information to patients. Nor is there any reason why doctors who fail to provide this information should be immune from liability under the theory of ostensible agency.

¶ 23 Having determined that ostensible agency is applicable when a physician performs an in-office procedure using the assistance of an independent contractor nurse, we must now examine whether Appellant in the instant case presented sufficient evidence to warrant the submission of the issue of ostensible agency to the jury. Two factors are relevant to a finding of ostensible agency in this case: (1) whether the patient looks to the doctor, rather than the independent contractor nurse for care and (2) whether the doctor 'holds out' the independent contractor nurse as his/her employee. *See Goldberg, supra.*

¶ 24 With respect to the first factor, the evidence adduced at trial showed that Appellant looked to Appellee, Dr. Howard S. Freilich, for care, rather than the independent contractor nurse, Robert Shaw. Prior to the colonoscopy procedure, Appellant had previously been in Dr. Freilich's care. On the other hand, prior to the procedure, Appellant had never met, nor had she been under the care of the independent contractor nurse, Robert Shaw.

¶ 25 Under the second factor, it must be determined whether Appellee, Dr. Freilich, held out the independent contractor nurse

as his employee, that is, whether Dr. Freilich acted or omitted to act in some way which leads the patient to a reasonable belief that she is being treated by Appellee or one of his employees. Dr. Freilich did not affirmatively tell Appellant that Nurse Shaw was his employee. On the other hand Dr. Freilich did not expressly inform Appellant that Nurse Shaw was an independent contractor. Appellees argue or suggest that the letterhead of the anesthesia consent form and the history form signed by Appellant informed or should have informed Appellant that Nurse Shaw was an independent contractor and not Dr. Freilich's employee. We disagree.

¶ 26 Although the above referenced letterheads did not bear the name Dr. Freilich, or his practice group, Northeast, Gastroenterology, Inc., both Dr. Freilich and Appellant signed the form. Besides, the letterheads did not indicate the relationship between Nurse Shaw and Dr. Freilich. Neither Dr. Freilich nor Nurse Shaw pointed out the letterheads to Appellant. N.T. 1/2/2001, at 77. The letterheads did not indicate whether Nurse Shaw was an employee or an independent contractor engaged by Dr. Freilich. Neither the letterheads nor the anesthesia consent form indicates that Nurse Shaw was an independent contractor or that Dr. Freilich could not be held liable for Nurse Shaw's negligence. Thus, we conclude that the forms and the letterheads contained therein did not inform Appellant of Nurse Shaw's status as an independent contractor. Under the circumstances of this case, given Dr. Freilich's failure to inform Appellant of Nurse Shaw's independent contractor status, a patient in Appellant's position could have been led to a reasonable belief that Nurse Shaw was indeed Dr. Freilich's employee.

¶ 27 Based on the forgoing discussion, we find that the trial court erred in grant-

ing a nonsuit in favor of Appellees on the issue of the applicability of ostensible agency theory. The court also erred in denying appellant's proposed points for charge embodying the theory of ostensible agency. This action by the trial court was improper because in light of the evidence presented by Appellant, the jury could reasonably have determined that both of the factors relevant to a finding of ostensible agency were present. Accordingly, we will reverse the order of the trial court and remand for further proceedings consistent with this opinion.

¶ 28 Order Reversed. Case remanded for a new trial. Jurisdiction relinquished.

¶ 29 KELLY, J., files Concurring and Dissenting Opinion.

KELLY, J., Concurring and Dissenting.

¶ 1 I agree that the trial judge did not violate the coordinate jurisdiction rule when it granted Appellee's motion for nonsuit. However, I must depart from the majority's decision on the application of ostensible agency and on the ultimate disposition of the case.

¶ 2 *Capan, supra* and its progeny have consistently reiterated that ostensible agency is an **exception** to the general rule of nonliability of the principal for the torts committed by an independent contractor. *See id.* at 648; Section 429 Restatement (Second) of Torts. In support of its decision to apply ostensible agency to hospitals, *Capan* notes the changing role of the hospital in society, which has led to the likelihood that patients will look to the hospital rather than to the individual physician for care. *Id.* at 649. The second justification for applying ostensible agency is if the hospital "holds out" the physician as its employee. *Id.* A "holding out" occurs "when the hospital acts or omits to act in some way which **leads the patient to a reasonable belief** that [she] is being

treated by the hospital or one of its employees." *Id.* (emphasis in original). In its determination to apply ostensible agency to the facts of the case before it, the *Capan* Court noted the lack of evidence that the hospital informed Mr. Capan of the doctor's independent contractor status *or* lack of evidence of any reason why Mr. Capan **should have been on notice** of the doctor's independent employment status. *Id.* at 650.

¶ 3 The party asserting ostensible agency has the burden to raise a fact issue on whether the principal held out the independent contractor as an agent or employee, or knowingly allowed the independent contractor to hold himself out as such. Unless the services of the independent contractor are accepted in the **reasonable** belief that the independent contractor is an employee of the principal, that burden has not been sustained. *See id.*

¶ 4 In the instant case, there is no dispute that Appellant looked to Appellee for her initial care. The question here is whether Appellee held out the nurse anesthetist as an employee *or* whether Appellant **should have been on notice** that the nurse anesthetist was not a part of the physician's staff. *Id.* In other words, would a prudent patient in Appellant's position have assumed that Nurse Shaw was Appellee's employee?

¶ 5 Here, Appellant admitted she had received, filled out, and signed two new forms, a health history form and an authorization form, related strictly to her anesthesia. Both forms contained conspicuous information that the person administering the anesthesia would be from R & P Anesthesia Associates. The anesthesia authorization form also directed further inquiries to the two persons listed on the form at a location and telephone number different

from that of Appellee's group. The anesthesia authorization specifically states:

> I hereby authorize and request R & P ANESTHESIA ASSOCIATES to administer the necessary anesthetics to _____(Name) which, in their opinion, may be deemed appropriate for the surgical procedure to be performed by _____(Physician's Name) on _____(Date).
>
> I certify that the nature of the anesthetic procedures, including risks and possible complications, have been explained to me and that I understand the purpose of this authorization form.

(*See* Anesthesia Authorization, attached as Exhibit D to Appellee's Motion for Summary Judgment). Additionally, Appellant testified she had not met or ever seen Nurse Shaw on any visit to Appellee's office before the day of the procedure. Appellant presented no evidence that Appellee had billed her or her insurance for the anesthesia component of the procedure. Appellant's assumption that Nurse Shaw worked for Appellee was not reasonable in light of the evidence putting her on notice that Nurse Shaw worked for someone else.

¶ 6 Moreover, ostensible agency is essentially an affirmative defense to the assertion of independent contractor status. Each time a physician provides services in his office, the physician does not necessarily hold out his office as a "full service institution." Thus, an ostensible agency theory of liability for the physician's independent contractors should not arise simply because the physician offers services to patients in his office. Granted, due to the changing nature of medical care, an increasing number of procedures may be performed outside the hospital or in the physician's office. Nevertheless, my chief concern lies with the broad imposition of an affirmative duty upon all physicians,

using the services of an independent contractor to perform an in-office medical procedure, to explain and ensure the patient's understanding of the legal distinction between an employee and an independent contractor. The imposition of this affirmative duty fails to recognize that the ostensible agency theory of liability can be avoided by indirect notice as well. *See Capan, supra.* The imposition of this affirmative duty on individual physicians is a significant change in the law, and places additional legal and financial burdens upon the physician for the actions of others who are not the physician's employees.

¶ 7 Under the facts of this case, I conclude the trial court properly refused to send "ostensible agency" to the jury. Accordingly, on the issue of ostensible agency, I must dissent.