**Fenchen v. St. Luke's Hospital**

C.P. of Northampton County, no. C0048 CV2001 007202.

*John P. Kopesky,* for plaintiffs.
*Paul F. Laughlin,* for defendant.

BARATTA, *J.,* February 1, 2005—

## I. FACTUAL AND PROCEDURAL HISTORY

Presently before the court is defendant, St. Luke's Hospital's motion for summary judgment in plaintiffs', George D. Fenchen and Chrystyna M. Fenchen's, medical malpractice action against St. Luke's and several physician-defendants. In its motion, St. Luke's claims that it cannot be directly liable or liable under a theory of ostensible agency to plaintiffs.

By way of factual background, the plaintiffs, Mr. and Mrs. Fenchen, are married. At the time of the alleged malpractice, Mr. Fenchen was 47 years old. Mr. Fenchen has attended medical school in the Dominican Republic. However, he is not licensed to practice medicine in the United States or abroad, but has been employed in the medical field within the United States. On May 6, 1999,

Mr. Fenchen visited South Mountain Medical Center concerning discomfort in and around his hips. After an ELISA test at South Mountain, Mr. Fenchen was diagnosed with Lyme disease with myelitis.

Following his visit at South Mountain, Mr. Fenchen was admitted as an in-patient into St. Luke's by Dr. Christopher Snyder of South Mountain on May 7, 1999, to determine whether his symptoms were the result of Lyme disease with myelitis, or whether the myelopathic symptoms he was experiencing were the result of a spinal cord lesion or some other etiology.

Kirth W. Steele D.O., of South Mountain, was Mr. Fenchen's attending physician at St. Luke's. As a result of Mr. Fenchen's symptoms and complaints, he had an in-hospital consultation with neurologist, Sharon A. Beckhard M.D. Dr. Beckhard examined Mr. Fenchen on May 7, 1999. Dr. Beckhard's initial diagnosis was: (a) Lyme disease or some other myelitis affecting the thoracic spine; (b) early onset of Guillain-Barré Syndrome; (c) Amyotrophic Lateral Sclerosis, the presence of which was doubted; and (d) the presence of a spinal cord mass or lesion, the presence of which was also doubted. Based on her examination, Dr. Beckhard ordered various tests and procedures to further aid in the diagnosis of Mr. Fenchen's condition, including: (a) an MRI of Mr. Fenchen's thoracic spine, with Gadolinium enhancement, to rule out the presence of a spinal cord lesion; (b) a lumbar puncture for the purpose of obtaining a sample of Mr. Fenchen's cerebrospinal fluid for pathologic analysis; (c) an electromyogram and a nerve conduction to aid in the diagnosis of Guillain-Barré Syndrome or Amyotrophic Lateral Sclerosis; and (d) a western blot to confirm the presence of Lyme disease.

Later on May 7, 1999, an MRI of Mr. Fenchen's spine was performed at St. Luke's Hospital. The MRI films were then read and interpreted by defendant, Brian S. Polesuk M.D. At the time when Dr. Polesuk read Mr. Fenchen's MRI films, he was employed by Valley Medical Imaging Associates, and was an independent contractor of St. Luke's. See deposition of Dr. Polesuk, 10/20/03, pp. 8-9. Dr. Polesuk interpreted the MRI films of Mr. Fenchen's thoracic spine as having a "normal MRI appearance." At that time, and in reliance to Dr. Polesuk's report, Dr. Beckhard did not review the films from Mr. Fenchen's thoracic spine MRI.

The lumbar puncture was consistent with the possibility of Lyme disease but was otherwise non-diagnostic. The nerve conduction study ordered by Dr. Beckhard was normal and the electromyogram was "limited" and non-diagnostic. Consequently, Mr. Fenchen was diagnosed with Lyme disease with myelitis. Mr. Fenchen was discharged from St. Luke's Hospital on May 13, 1999, with directions for "aggressive intravenous Rocephin therapy as an outpatient as well as physical therapy."

Thereafter, over the summer months of 1999, Mr. Fenchen followed the regiment of physical therapy prescribed; however, his condition did not improve. By early October 1999, Mr. Fenchen's condition had deteriorated as he lost some control of his bowel and bladder functions; had difficulty in obtaining and maintaining an erection; his skin tone and skin texture were altered; and he was experiencing muscle atrophy in his lower extremities and buttocks.

As a result, on October 8, 1999, a second MRI of Mr. Fenchen's thoracic spine was ordered by Dr. Beckhard

and performed at MRI of Easton. The films from the second MRI of Mr. Fenchen's thoracic spine were examined and interpreted by Christopher Chapman M.D. After reviewing the MRI films, Dr. Chapman's report revealed that Mr. Fenchen's spine contained no lesions.

After receiving Dr. Chapman's report, Dr. Beckhard reviewed the October 8, 1999 MRI films. Dr. Beckhard observed evidence of an arteriovenous fistula in Mr. Fenchen's spine. Dr. Beckhard then reviewed the May 7, 1999 MRI films and again observed evidence of an arteriovenous fistula of the spine. Consequently, Dr. Beckard suspected a vascular anomaly, and ordered a spinal angiogram on November 1, 1999, for Mr. Fenchen.

On November 1, 1999, a spinal angiogram confirmed that Mr. Fenchen had an arteriovenous fistula. Then, on November 23, 1999, Mr. Fenchen was transferred to Wills Eye Hospital, where he underwent a corrective procedure. The surgery proved effective; however, Mr. Fenchen continues to have neurological disorders including bladder and bowel control problems, diminished sexual function, a significant limp, and he requires the use of pain medication.

Plaintiffs allege that the delay in the diagnosis and treatment of Mr. Fenchen's arteriovenous fistula increased the risk that he would suffer permanent nerve damage and impairment of neurological function.

Plaintiffs originally filed the medical malpractice action on September 18, 2001, by writ of summons, against St. Luke's, Dr. Beckhard, Neurology of Bethlehem P.C., Dr. Polesuk, Michael Sachenik M.D., Dr. Chapman, Kirth Steele D.O., and MRI of Easton who treated Mr. Fenchen from May through August 1999. A complaint was sub-

sequently filed by the plaintiffs on November 29, 2001. However, since the complaint was filed, defendants Dr. Beckhard, Neurology of Bethlehem P.C., Dr. Chapman, Dr. Sachenik, and MRI of Easton have been dismissed.

Plaintiffs' complaint alleges liability against St. Luke's on the basis of vicarious liability or, in the alternative, that St. Luke's was holding out the physicians named in the complaint as attending physicians, staff physicians, residents, interns, externs, employees, agents, servants and/or workers of St. Luke's. See plaintiffs' complaint, ¶¶112-13. Plaintiffs claim that St. Luke's is liable to plaintiffs under the theory of ostensible agency, because plaintiff entered the hospital to receive treatment and was misdiagnosed by the named defendant doctors, specifically Dr. Polesuk's reading of the May 7, 1999 MRI films.[1]

St. Luke's filed the instant motion for summary judgment on October 18, 2004. The matter was listed for the January 4, 2005 argument list.

## II. LEGAL STANDARD

Pennsylvania Rule of Civil Procedure 1035.2 states:

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party

---

1. St. Luke's has questioned the adequacy of plaintiffs' complaint with regard to the theory of ostensible agency. The purpose of pleadings is to place the defendants on notice of the claims upon which they will have to defend. See *McClellan v. Health Maintenance Organization of Pennsylvania,* 413 Pa. Super. 128, 604 A.2d 1053 (1992); see also, *Yacoub v. Lehigh Valley Medical Associates P.C.,* 805 A.2d 579 (Pa. Super. 2002), *appeal denied,* 573 Pa. 692, 825 A.2d 639 (2003). Here, a fair reading of the complaint gives St. Luke's adequate notice of plaintiffs' claim.

may move for summary judgment in whole or in part as a matter of law

"(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to the jury." Pa.R.C.P. 1035.2.

Summary judgment may be granted only in the clearest of cases where the record shows that there are no genuine issues of material fact and also demonstrates that the moving party is entitled to judgment as a matter of law. *Trowbridge v. Scranton Artificial Limb Co.,* 560 Pa. 640, 747 A.2d 862 (2000); *P.J.S. v. Pennsylvania State Ethics Commission,* 555 Pa. 149, 153, 723 A.2d 174, 176 (1999). Summary judgment is only appropriate in the clearest of cases because an order favorable to the moving party will prematurely end an action. *Scopel v. Donegal Mutual Insurance Company,* 698 A.2d 602 (Pa. Super. 1997).

The moving party has the burden of proving the non-existence of any genuine material fact. *O'Rourke v. Pennsylvania Department of Corrections,* 730 A.2d 1039, 1041 (Pa. Commw. 1999); citing *Kee v. Turnpike Commission,* 722 A.2d 1123 (Pa. Commw. 1998). Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof . . . establishes the entitlement of the moving party to judgment as a matter of law. *Murphy v.*

*Duquesne University of the Holy Ghost,* 565 Pa. 571, 590, 777 A.2d 418, 429 (2001), citing *Young v. PennDOT,* 560 Pa. 373, 376, 744 A.2d 1276, 1277 (2000). The record must be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Ertel v. Patriot-News Co.,* 544 Pa. 93, 98-99, 674 A.2d 1038, 1041 (1996).

### III. DISCUSSION

St. Luke's argues that it is entitled to summary judgment in this matter because plaintiffs have provided no direct evidence of St. Luke's breaching a duty of care to Mr. Fenchen nor is there sufficient evidence to support liability based on ostensible agency. St. Luke's further contends that summary judgment is also warranted against Mrs. Fenchen's derivative claim for loss of consortium.

First, plaintiffs are in agreement with St. Luke's that there is no evidence to support a claim of direct negligence on the part of St. Luke's. See plaintiffs' revised memorandum, 12/27/04, p. 10. Additionally, plaintiffs are not proceeding against St. Luke's on a traditional theory of vicarious liability. Thus, our sole issue is whether St. Luke's may be liable to plaintiffs under the theory of ostensible agency.

Generally, a hospital is not liable for the negligence of their independent contractor physicians. However, an exception to this general rule based on Restatement (Second) of Torts §429[2] was recognized by the Superior Court

2. Restatement (Second) of Torts §429 provides: one who employs an independent contractor to perform services for another which are

in *Capan v. Divine Providence Hospital,* 287 Pa. Super. 364, 430 A.2d 647 (1980). *Capan* recognized that a physician may be considered an "ostensible" agent of a hospital, such that the hospital may be liable for the malpractice of independent contractor physicians.

*Capan* involved a physician's negligent care of a patient while in a hospital emergency room. The patient brought suit against the hospital and the hospital defended on the ground that the physician was not its agent, but was an independent contractor retained to service its emergency room.

The Superior Court held that there are two factors that must be examined when addressing a claim for ostensible agency: (1) whether the patient looked to the institution, rather than the individual physician for care, and (2) whether the hospital holds out the physician as its employee. *Id.* at 369, 430 A.2d at 649. See also, *Yacoub v. Lehigh Valley Medical Associates P.C.,* 805 A.2d 579 (Pa. Super. 2002), *appeal denied,* 573 Pa. 692, 825 A.2d 639 (2003); *Goldberg ex rel. Goldberg v. Isdaner,* 780 A.2d 654, 660 (Pa. Super. 2001); *Parker v. Freilich,* 803 A.2d 738 (Pa. Super. 2002).

A "holding out" occurs when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees. See *Capan, supra; Yacoub, supra.*

---

accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

In *Capan,* the court found that the patient, in going to the hospital's emergency room for treatment, was looking to the hospital as an institution as opposed to a specific emergency room physician for care. Additionally, the hospital was deemed to be holding itself out to the public as being responsible for the physicians working in the emergency room. The hospital was held liable to the patient.

On March 20, 2002, the MCARE Act was enacted in this Commonwealth establishing the statutory standard for ostensible agency. The MCARE Act provides:

"(a) *Vicarious liability.*—A hospital may be held vicariously liable for the acts of another health care provider through principles of ostensible agency only if the evidence shows that:

"(1) a reasonably prudent person in the patient's position would be justified in the belief that the care in question was being rendered by the hospital or its agents; or

"(2) the care in question was advertised or otherwise represented to the patient as care being rendered by the hospital or its agents.

"(b) *Staff privileges.*—Evidence that a physician holds staff privileges at a hospital shall be insufficient to establish vicarious liability through principles of ostensible agency unless the claimant meets the requirements of subsection (a)(1) or (2)." See 40 Pa.C.S. §1303.516. The MCARE Act is in line with the *Capan* decision, however it is *Capan* and its progeny that has developed the law with respect to ostensible agency.

In *Simmons v. St. Clair Memorial Hospital,* 332 Pa. Super. 444, 481 A.2d 870 (1984), an admitting physician was held to be the ostensible agent of the defen-

dant-hospital. The decedent committed suicide while he was a patient in the psychiatric unit of the defendant-hospital. Decedent had been to the hospital twice, and it was during the second trip that he committed suicide. On this first visit decedent was admitted to the hospital via the emergency room and Dr. Alan Wright was the on-call physician. When decedent was admitted, decedent's parents were told that Dr. Wright was the head of the hospital's psychiatry department and that he was qualified. At the second admission, Dr. Wright admitted the decedent. At all times, Dr. Wright was an independent contractor to the hospital; however, in his role as department head, he was responsible for the psychiatry department's administration, including handling problems with patient care. When decedent was admitted the second time, he was placed on general observation and not a heightened suicide observation.

The court held that there were factual issues present for the jury as to whether Dr. Wright was an ostensible agent of the hospital. Decedent had entered the hospital via the emergency room, and the decedent's parents were told that Dr. Wright was qualified and the head of psychiatry in the hospital. Therefore, the jury could reasonably conclude that the decedent looked to the hospital for care and that the hospital "held out" the doctor as its employee. *Id.*

In the present case, an analysis of the two factors set forth by the court in *Capan* leads to the conclusion that there are material issues of fact present as to whether Dr. Polesuk is an ostensible agent to St. Luke's. While Mr. Fenchen was not admitted to St. Luke's via the emergency room, he was admitted for the purposes of the

availability and use of equipment located within the hospital for diagnosis of his condition. Simply stated, he was told that he needed to get an MRI while at St. Luke's. While in the hospital, the staff wheeled him into the MRI room for the procedure, which was later given to Dr. Polesuk to interpret. Mr. Fenchen did not meet Dr. Polsesuk, nor did he seek to retain the services of Dr. Polesuk.

St. Luke's argues that there is no evidence that Dr. Polesuk was "held out" as its employee or agent. St. Luke's contends that there were no representations made to Mr. Fenchen that Dr. Polesuk was an employee of St. Luke's, and therefore, it should have been clear that Mr. Fenchen's personal physicians were orchestrating his care. In addition, St. Luke's argues that Mr. Fenchen's medical training and experience in the medical field should have put him on proper notice of the status of the physicians practicing at St. Luke's.

We find this argument unconvincing. As stated previously, a "holding out" occurs when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees. While Mr. Fenchen's knowledge of general medical practices may be evidence that he has some familiarity with the inner workings of a hospital, it does not preclude a jury from reasonably believing that Dr. Polesuk qualifies as an ostensible agent of the hospital. The record suggests that Mr. Fenchen sought treatment from St. Luke's for testing and diagnosis of his condition. Thus, there is a factual issue as to whether Mr. Fenchen reasonably looked to the hospital for the proper diagnosis of his MRI results and whether the actions of St. Luke's

can be reasonably considered as holding out Dr. Polesuk as an agent or employee of the hospital.

Therefore, because summary judgment may only be entered in the clearest of cases, and because there are questions of material fact present as to whether Dr. Polesuk was the ostensible agent of St. Luke's, summary judgment cannot be entered. Furthermore, because we are denying summary judgment as it pertains to Mr. Fenchen's claims against St. Luke's, summary judgment is not appropriate for Mrs. Fenchen's loss of consortium claim against St. Luke's.

## IV. CONCLUSION

For the reasons noted herein, St. Luke's motion for summary judgment is denied.

## ORDER

And now, February 1, 2005, the motion for summary judgment filed on behalf of the defendant, St. Luke's Hospital, is denied.