**Kuhn v. Maxwell**

C.P. of Adams County, no. 06-S-1331.

*Thomas W. Hall,* for plaintiff.
*Evan Black,* for defendant.

GEORGE, *J.,* October 22, 2008—Before the court for disposition is a motion for summary judgment filed on behalf of the defendant, Gettysburg Hospital. The hospital seeks summary judgment in their favor on a professional liability complaint filed by Patricia A. Kuhn against the hospital, Gettysburg Surgical Associates Inc. (GSA), and two treating physicians. The sole claim against the hospital is one of vicarious liability for the negligent acts of the treating physicians. The hospital seeks judgment in their favor arguing that Kuhn cannot establish that the treating physicians were employees or agents of the hospital.

Before granting summary judgment in favor of a party, the court must find that there is no genuine issue of material fact as to a necessary element of the cause of action and that the party is entitled to judgment as a matter of law. *Kvaerner Metals Division. of Kvaerner U.S. Inc. v. Commercial Union Insurance Company,* 589 Pa. 317, 908 A.2d 888, 895 (2006). In considering a motion for summary judgment, the trial court must look at the facts in the light most favorable to the non-moving party. *Baker v. Cambridge Chase Inc.,* 725 A.2d 757, 764 (Pa. Super. 1999). Additionally, the trial court must ig-

nore controverted facts contained in the pleadings. *Overly v. Kass,* 382 Pa. Super. 108, 112, 554 A.2d 970, 972 (1989). Summary judgment should only be granted if the facts are so clear that reasonable minds could not differ. *Kvaerner,* 589 Pa. at 329, 908 A.2d at 896. In determining whether or not there is a genuine issue of material fact, the court may properly review all pleadings, depositions, answers to interrogatories, admissions, affidavits, and reports which comply with Rule 4003.5(1) of the Pennsylvania Rules of Civil Procedure. See Pa. R.C.P. 1035.1; *Baker v. Cambridge Chase Inc., supra* at 764.

In reviewing the record in the light most favorable to Kuhn, the factual background reveals the following:

On May 23, 2004, Kuhn, age 58, appeared at the emergency department at the hospital complaining of chest pain, heartburn, and symptoms of epigastric[1] bloating. A chest x-ray examination conducted by the hospital revealed a large central hiatal hernia. After reviewing the results of the x-ray, the emergency room physician, Dr. William Steinour, referred Kuhn to GSA for follow-up care. The hospital's emergency department patient instruction form instructed, as follow-up care, a return to the emergency department if needed and to call Dr. Maxwell[2] on the following Monday for an appointment. Kuhn was thereafter released by the hospital emergency department.

---

1. Mosbys Medical, Nursing, and Allied Health Dictionary, 6th edition, defines epigastric as to pertaining to the epigastrium, the area above the stomach.

2. Dr. Henry L. Maxwell is a physician licensed to practice medicine in the Commonwealth of Pennsylvania and is a practicing physician with GSA. Dr. Maxwell is a named defendant in this action.

Some time after leaving the emergency department, Kuhn called GSA and scheduled an appointment at the private offices of GSA. She was able to secure an appointment and was seen by Dr. Timothy R. McKee[3] on June 2, 2004 at the offices of GSA. Following her examination by Dr. McKee, Kuhn underwent several diagnostic tests including an esophageal manometery performed at the Hershey Medical Center. Following diagnostic testing, Dr. McKee performed an esophagogastroduodenoscopy[4] at the Wellspan Health Center on July 6, 2004. The test identified a large hiatal hernia measuring at least 6 cm(s) in diameter.

On November 1, 2004, Kuhn returned to the offices of GSA and, once again, consulted with Dr. McKee. As a result of the consultation and evaluation, Dr. McKee recommended a plan consisting of a reduction of the paraesophageal hernia and repair to the diaphragm. On November 30, 2004, Kuhn was admitted to the hospital under the care of Dr. McKee. On that same date, Dr. McKee performed the surgery. Throughout the surgery, he was assisted by an employee of GSA, Tara Hall, PA-C. Following surgery, Kuhn was discharged to her home on December 2, 2004.

On December 9, 2004, Kuhn returned to the offices of GSA and consulted with Tara Hall, PA-C, for follow-up.

---

3. Dr. Timothy R. McKee is a physician licensed to practice medicine in the Commonwealth of Pennsylvania and is a practicing physician at GSA. Dr. McKee is a named defendant in this action.

4. An esophagogastroduodenoscopy is an endoscopic test that permits direct visualization of the upper GI tract and involves insertion of a long, flexible fiber-optic-lighted scope permitting examination of tumors, inflammation, hernias, ulcers, and obstructions. Mosbys Medical, Nursing, and Allied Health Dictionary, 6th edition.

On February 18, 2005, Kuhn appeared at the emergency department of Hospital. While there, she consulted with Dr. Maxwell. Kuhn was complaining of chest pain and nausea. An x-ray taken at the hospital revealed a large hiatal hernia. Dr. Maxwell performed a subsequent surgery at the hospital on February 24, 2005. During the course of surgery, he was assisted by Tara Hall, PA-C. Following surgery, Kuhn was discharged from the hospital on March 2, 2005. Several days later, on March 9, 2005, Kuhn appeared at the offices of GSA and consulted with Dr. Maxwell. As a result of the consultation, Dr. Maxwell re-admitted her to the hospital. Following an upper GI series conducted to rule out a surgical leak, Kuhn was discharged from the hospital on March 15, 2005. The upper GI series revealed no evidence of leaking.

On March 22, 2005, Kuhn returned to GSA complaining of difficulty swallowing. Although the record is not clear, it appears she was released by Dr. Maxell after consultation. However, she returned to GSA on April 18, 2005 with the same complaint. An upper gastrointestinal endoscopy was performed by Dr. Maxwell on April 26, 2005. Kuhn returned to Dr. Maxell's office with continued complaints of dysphasia on May 3, 2005. On May 11, 2005, Dr. Maxwell re-admitted Kuhn to the hospital. Thereafter, she was transferred to the Hershey Medical Center on May 16, 2005.

Although discharged from the Hershey Medical Center, Kuhn claims to remain under intensive medical care and treatment as she continues to suffer from dysphasia, abdominal pain, and weight loss.

Gettysburg Hospital is a hospital duly licensed under laws of the Commonwealth of Pennsylvania. Neither Dr.

Maxell nor Dr. McKee are employed by the hospital. Additionally, neither physician is an independent contractor of the hospital. Both physicians, however, have staff privileges permitting both the ability to admit patients to the hospital for surgical treatment.

Undoubtedly, Pennsylvania law provides that an employer may be vicariously liable for the harm caused by the negligence of an employee. See *The Milton S. Hershey Medical Center of The Pennsylvania State University v. Pennsylvania Medical Professional Liability Catastrophe Loss Fund,* 573 Pa. 74, 85, 821 A.2d 1205, 1212 (2003). This general rule, however, does not extend liability for torts committed by an independent contractor hired by an employer. *McDonough v. U.S. Steel Corporation,* 228 Pa. Super. 268, 273, 324 A.2d 542, 545 (1974). Nevertheless, in the area of professional malpractice claims, appellate courts have held employers responsible for the acts of independent contractors in certain instances under a theory of ostensible agency. In *Capan v. Divine Providence Hospital,* 287 Pa. Super. 364, 368, 430 A.2d 647, 648 (1980), the concept of ostensible agency was first recognized by the Superior Court. This theory provides that one who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer, is subject to liability for physical harm caused by the negligence of the independent contractor in supplying those services. *Capan* at 369, 430 A.2d at 648. The relevant factors in establishing ostensible agency are: (1) whether the patient looks to the institution, rather than the individual physician for care and (2) whether the hospital holds out the physician as its employee.

*Yacoub v. Lehigh Valley Medical Associates, P.C.,* 805 A.2d 579, 591 (Pa. Super. 2002) (quoting *Goldberg v. Isdaner,* 780 A.2d 654, 660 (Pa. Super. 2001). In regard to the latter factor, "[a] holding-out occurs when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees." *Capan* at 370, 430 A.2d at 649.

As it is undisputed that neither Dr. Maxwell nor Dr. McKee are employees or independent contractors of Hospital, the sole basis of Hospital's liability, if any, rests upon the theory of ostensible agency. Kuhn points to a number of factors in support of her claim. Initially, Kuhn suggests that she initially looked to the hospital for her care when she was at the emergency department on May 23, 2004. She suggests that Dr. Maxwell was held out as an employee of the hospital when she was referred to him for follow-up care. She notes that she was singularly referred to Dr. Maxwell rather than given the option to select from several surgeons.[5] In support of her argument, Kuhn highlights the two surgical procedures that were actually performed at the hospital. Finally, Kuhn cites her deposition testimony wherein she stated that she believed the doctors to be employees of the hospital. Kuhn deposition, p. 76.[6] She points to several Hospital

---

5. The patient instruction form given at discharge directs her to contact an individual physician. However, in her deposition, Kuhn claims to have been referred to the surgical group of physicians known as GSA.

6. Although Kuhn's deposition contains her claim that she believed the physicians to be employed by the hospital, earlier in her deposition, the following occurred:

"Q. Well, did you think they were employees of the hospital?

records which purportedly were signed by her at the time of her admission as corroboration of her belief that it was Hospital who was her primary care provider.[7]

Clearly, Kuhn has claimed a subjective belief concerning the hospital's relationship with Drs. Maxwell and McKee.[8] Nevertheless, her subjective assumption is not controlling. Rather, the question of whether an ostensible agency relationship exists is examined under an objective standard as to whether the patient's belief of being treated by the hospital or its employees is reasonable. *Yacoub, supra* at 591. Therefore, the critical focus is not on Kuhn's subjective belief but rather whether her belief is reasonable under the circumstances presented to her. As previously mentioned, in support of her suggestion that her belief was reasonable, she relies on two specific circumstances: (1) the referral by a hospital to a specific

---

"A. I wasn't sure how that worked, because I knew that they used the hospital for operating and things like that. But I didn't know I didn't know what their setup was." Kuhn deposition, p. 76.

7. The forms include a consent to anesthesia; a consent and authorization form referencing treatment, payment, and business operations; a consent to surgical and other therapeutic/diagnostic procedures form; and an agreement for blood transfusion. Additionally, Kuhn submitted unsigned documents carrying designation as Gettysburg Hospital forms. These unsigned forms consisted of a refusal to consent to treatment form and a refusal to consent to a blood transfusion form.

8. Hospital suggests that Kuhn's subjective claim that she assumed the hospital was providing her treatment is refuted by her own experiences. Hospital points out that Kuhn is extremely versed in the relationship between the Gettysburg Hospital Emergency Department and independent, community-based physicians. Hospital cites 725 occasions between 1983 and the current litigation during which Kuhn visited Hospital's emergency room. Additionally, Hospital claims that from November 30, 2004 through July 19, 2007, Kuhn sought services from Hospital's emergency room on an additional 65 occasions and from York Hospital's Emergency Department on seven separate occasions.

surgeon or association of surgeons and (2) the two surgical procedures conducted by the surgeons at the hospital pursuant to their staff privileges. For the reasons set forth below, I find that Kuhn is unable to objectively establish that her belief that the physicians were agents of the hospital was reasonable.

In considering the importance of the GSA surgeons possessing staff privileges at the hospital, I note that the Pennsylvania Legislature has enacted statutory guidance in this area. In 2002, the General Assembly adopted the Medical Care Availability and Reduction of Error Act, 40 Pa.C.S. §1303.101 et seq. (MCARE), as part of an effort to address Pennsylvania's medical malpractice crisis while ensuring appropriate legal process and reasonable compensation to persons injured due to medical negligence. As part of the legislation, the ostensible agency theory enunciated by *Capan* was codified. 40 P.S. §1303.501. The codification, however, was careful to note that evidence of a physician holding staff privileges at a hospital was insufficient, in and of itself, to establish vicarious liability under the principles of ostensible agency. 40 P.S. §1303.516(b). Thus, while the fact that the current surgery was performed at the hospital may be a relevant consideration, it is not controlling.

As MCARE clearly enunciates that the holding of staff privileges alone is insufficient to establish ostensible agency, survival of the claim against the hospital requires a greater showing on the part of Kuhn. In order to buttress her claim, Kuhn points to the hospital's referral to Dr. Maxwell as being sufficient to permit this action to move forward. The crux of the current issue, therefore, is whether the referral to GSA is an act sufficient to lead a reasonable person to believe that they were being

treated by the hospital or one of its employees. I determine, as a matter of law, that it is not.

Although I presume it as true that Kuhn was referred by Hospital staff to a specific surgeon, it is interesting to note that it was she who actually scheduled the initial appointment. In doing so, she made contact with GSA and ultimately scheduled her visit with a surgeon other than the one mentioned by the hospital. Therefore, Kuhn's claim, by necessity, translates to a claim that all surgeons at GSA were held out as employees of the hospital. Thus, the direct nexus that one might expect in an agency relationship is transparent. Certainly, a reasonable person understands that scheduling an appointment through a medical association separate of the hospital, without restriction as to the specific surgeon, is the first act in establishing a doctor/patient relationship with an entity separate from the hospital. Further indication that GSA was a distinct entity separate from the hospital is apparent when one considers that the appointments between Kuhn and GSA physicians occurred at the private offices of GSA. Incidentally, those appointments involved diagnostic and other procedures which occurred at locations other than the hospital, and, in fact, one occasion occurred at a separate and distinct hospital. Under these circumstances, the existing evidence in support of a finding of ostensible agency is insufficient to submit this matter to a jury.

Although I have been unable to uncover any post-MCARE appellate authority on this issue, earlier appellate decisions have required something more than a referral before an ostensible agency relationship is established. See *Capan v. Divine Providence Hospital,* 287 Pa. Super.

364, 430 A.2d 647 (1980) (patient admitted to hospital through emergency room department, initially treated at hospital by previously unknown doctor while in the care of the hospital); *Thompson v. Nason Hospital,* 370 Pa. Super. 115, 535 A.2d 1177 (1988) (patient being treated in emergency room when doctor, unknown to patient, summoned by a treating nurse to provide medical care while at the emergency room); *Walls v. Hazleton State General Hospital,* 157 Pa. Commw. 170, 629 A.2d 232 (1993), *appeal denied,* 536 Pa. 649, 639 A.2d 35 (1994) (patient being treated at hospital emergency department by emergency department physician who called an orthopedic surgeon to provide additional treatment while at the hospital); *Goldberg v. Isdaner,* 780 A.2d 654 (Pa. Super. 2001) (brochures and medical forms indicated affiliation between treating physician and hospital accompanied by physician's offices sharing entrance with hospital); *Yacoub v. Lehigh Valley Medical Associates,* 805 A.2d 579 (Pa. Super. 2002) (radiologists conducted studies on decedent in the hospital's radiology department when patient referred to hospital for diagnostic test). A common thread among all of these cases is that the patient turned to a hospital for medical care and subsequently received treatment by a previously unknown physician, or other expert, provided to the patient by the hospital. This factual scenario is simply non-existent in the current case.

The Superior Court in *Capan* recognized the need for an ostensible agency theory in light of the changing role of the hospital in society as patients look to the institutions of hospitals rather than the individual physicians for care. The court recognized that present-day hospitals do far more than furnish facilities for treatment. They

regularly employ, on a salary basis, a large staff of physicians, nurses, and interns and they charge patients for medical care and treatment rendered by these professionals. Based on this changing role of hospitals in society, the *Capan* court opined that "[i]t would be absurd to require such a patient to be familiar with the law of respondeat superior and so to inquire of each person who treated him whether he is an employee of the hospital or an independent contractor." *Capan* at 369, 430 A.2d at 649.

The concern recognized by the *Capan* court is simply not present instantly. Kuhn was treated and released by the hospital. She initiated contact with GSA several days after her interaction with the hospital. For all practical purposes, her relationship with the hospital had ended as she established a new relationship with GSA. As mentioned, the *Capan* rationale is founded on the presupposition that a patient does not normally visit an emergency room expecting to be treated by the hospital's independent contractors. Rather, a reasonable person rationally assumes that when they go to a hospital for treatment, and are subsequently treated at the hospital, that it is the hospital that is providing the treatment. It logically follows, therefore, that when a person visits a doctor's office for medical attention, and receives that attention from the office, that the patient expects that they are under that doctor's care. See generally, *Parker v. Freilich,* 803 A.2d 738, 748 (Pa. Super. 2002) (a patient attending a doctor's office reasonably expects that they are under the doctor's care). Stated another way, when a reasonable person schedules an appointment with a physician's office, they are looking to that physician for treatment and expecting care from that physician rather than from the referral source.

While I am mindful of the standard for granting summary judgment, I am also aware of this court's obligation to act as gatekeeper of our legal system to avoid unnecessary, time-consuming, and expensive litigation which lacks merit. Currently, the hospital did nothing more than competently render emergency services to Kuhn and refer her for further treatment to an independent physician. If evidence supports a finding of medical negligence by her treating physicians, that responsibility rightfully falls on those responsible for the negligent acts. However, the hospital had no part in the care or accompanying negligence. Requiring the hospital to remain in this litigation under the guise of the existence of a factual issue as to ostensible agency results in nothing more than unnecessary litigation and financial hardship to an innocent party.

For the foregoing reasons, the attached order is entered.

## ORDER

And now, October 22, 2008, the motion for summary judgment filed by Gettysburg Hospital is granted. Summary judgment is entered against the plaintiff and in favor of the defendant, Gettysburg Hospital. Litigation against the remaining defendants shall proceed as set forth in the Pennsylvania Rules of Civil Procedure.