J-A06027-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BRENDA L. BOLLINGER, ADMINISTRATRIX OF THE ESTATE OF TONYA M. FOCHT, DEC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| IRON ORDER MOTORCYCLE CLUB A/K/A IRON ORDER MOTORCYCLE CLUB, LLC, TIMOTHY MARTIN, ANNA'S BAR-B-Q-PIT, LTD., ANNA DELIGIANNIS, HIPPOCRATES "LUCKY" DELIGIANNIS, ELENI DELIGIANNIS, GRECIAN TERRACE, LTD., AND AA&L, LLC | : | |
| | : | |
| v. | : | |
| | : | |
| MARK STEPHEN GROFF, STEVEN SEIVARD, SHARI PRUIKSMA, WAYNE A. RITCHIE, DOUGLAS L. GOTTSCHALL, LAREE GOTSCHALL, KEITH FRITZ, MICHAEL PETERSHEIM, AND RONALD MERCEDES | : | No. 3446 EDA 2018 |

Appeal from the Judgment Entered November 16, 2018
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): July Term, 2015, No. 000429

BEFORE: STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                    **FILED NOVEMBER 16, 2020**

Appellant, Brenda L. Bollinger, administratrix of the estate of Tonya M.

Focht ("Decedent"), appeals from the judgment entered in the Philadelphia

_____

[*] Former Justice specially assigned to the Superior Court.

County Court of Common Pleas, following the denial of her post-trial motion to remove the compulsory non-suit in favor of Appellee, Iron Order Motorcycle Club, a/k/a Iron Order Motorcycle Club, LLC ("IOMC").[1]  We affirm.

The relevant facts and procedural history of this case are as follows.  On June 19, 2015, Decedent and her fiancée Mark Groff ("Mr. Groff") were involved in a bar fight with several members of a local chapter of the IOMC at Anna's Bar-B-Q Pit in Sinking Spring, Pennsylvania.  During the course of the fight, Timothy Martin ("Mr. Martin"), a local chapter member, shoved or punched Decedent to the ground where she was hit by a passing motorist. Decedent died as a result of her injuries.

Appellant, Decedent's mother, filed a complaint for negligence, assault, battery, and other theories of liability against numerous parties involved in the bar fight.  In one of her amended complaints, Appellant named the IOMC as a defendant.[2]  Appellant alleged theories of vicarious/ostensible liability against the IOMC, claiming, *inter alia*, Mr. Martin and the other local chapter members involved in the bar fight acted as agents of the IOMC at the time of

_____

[1] All references to the IOMC in this memorandum are to the national or international IOMC, unless otherwise stated.  The parties have referred to the IOMC as the "national IOMC" or the "international IOMC" interchangeably throughout this litigation.  The local Reading, Pennsylvania chapter of the IOMC, in which some of the participants of the events forming the genesis of this litigation were members and which is not a party to this litigation, will be referred to as the "local chapter."  The other defendants named in the caption are not parties to this appeal.

[2] Appellant did **not** name the local chapter as a defendant in this case.

- 2 -

the fight. Appellant filed her fourth and most recent amended complaint on July 31, 2017. On November 6, 2017, the IOMC filed a motion for summary judgment. The Honorable Linda Carpenter denied the motion on March 5, 2018. The order denying relief states:

> …the motion is denied as genuine issues of material fact remain, specifically it is for the jury to determine: whether members of the [IOMC] engaged in the fight in their capacity as agents of moving defendants; whether members of the [IOMC] were required to act per rules governing their membership; and the level of control of the [IOMC] over its chapters and members.

(Order Denying IOMC's Motion for Summary Judgment, 3/5/18, at 1; R.R. at 855a) (internal footnote omitted).

On May 31, 2018, Appellant filed notices to attend directed at four of the IOMC's corporate officers: Bob Ellis (Regional Director at the time of Decedent's death), Patrick Ward (International President), Michael Crouse (International Vice President), and John Whitfield (Director of Legal Affairs and member of the International Board of Directors).[3] The IOMC filed a motion to quash the notices to attend on June 14, 2018, asserting the notices failed to comply with the relevant rules of civil procedure. Specifically, the IOMC

---

[3] Earlier in the proceedings, Mr. Whitfield served as the IOMC's counsel. On February 5, 2018, Appellant filed a motion to disqualify Mr. Whitfield from representing the IOMC, claiming Mr. Whitfield was a "necessary witness" to discuss the IOMC's "culture of violence" and "violations of its own bylaws." Following a hearing on April 4, 2018, the court disqualified Mr. Whitfield from representing the IOMC as lead counsel but permitted Mr. Whitfield's law firm to continue representing the IOMC.

claimed the notices to attend required four individuals who reside in states outside of Pennsylvania to be available, on telephone notice, as of June 25, 2018, to appear as a live witness at any time during the several weeks scheduled for trial. The IOMC maintained the notices to attend were entirely vague, Appellant did not explain what relevant testimony the witnesses had to offer, and Appellant did not allege why these witnesses' deposition testimonies could not be used instead of live testimony given their varying geographic locations.

In response, Appellant conceded Bob Ellis was not an indispensable witness, and Appellant could use his deposition testimony if needed. Regarding the other witnesses, however, Appellant insisted their live testimony was required because those witnesses are managing agents of the IOMC. Appellant further emphasized that counsel did not intend for the witnesses to be available any time during a period of weeks; rather, counsel said the intent was to make the witnesses aware of their required testimony and counsel would arrange the appropriate date and time for such testimony with opposing counsel.

On June 25, 2018, the court granted the motion to quash. Nevertheless, the court handwrote into the order: "If the testimony at trial shows a basis for calling these witnesses this court will reconsider this ruling and may permit [Appellant] to call one or more of these potential witnesses." (Order Granting Motion to Quash Notices to Attend, 6/25/18, at 1; R.R. at 1941a).

Meanwhile, the IOMC also filed separate motions *in limine* to preclude expert testimony from Raymond Lubesky, a founder and former President of the IOMC, and to exclude introduction of the IOMC's prospect manual and general information for prospective members. With respect to Mr. Lubesky's proffered expert testimony, the IOMC alleged that his "expert" report consists of nothing more than personal opinion devoid of any industry standards of methodology, and is intended to serve as a conduit for inadmissible, prejudicial evidence from an expelled president who is biased against the IOMC.[4]

Concerning the prospect manual and related materials, the IOMC maintained that the local chapter members involved in the bar fight were active members, not prospective members of the local chapter of the IOMC, so those materials were irrelevant. Further, the IOMC insisted the proffered materials do not promote violence but do contain misogynistic content that Appellant wanted to highlight to prejudice the IOMC. The court dismissed the motions without prejudice, to be ruled on at trial.

Trial began with jury selection before the Honorable Kenneth Powell.[5]

_____

[4] Mr. Lubesky's expert report casts the IOMC in a profoundly negative light. According to Mr. Lubesky, under his presidency, the IOMC was the largest, most successful, law-abiding motorcycle club in history. Mr. Lubesky opined that new leadership of the IOMC transformed it into a violent, outlaw motorcycle gang.

[5] Appellant's claims against all defendants named in the complaints other than the IOMC and Mr. Martin were resolved prior to trial.

On June 26, 2018, while the court was addressing pre-trial motions, Mr. Martin appeared and explained that he could not be present in court every day for the next two weeks due to work and family obligations. The court said if Mr. Martin failed to appear, it would enter a default judgment against Mr. Martin concerning his liability. Mr. Martin acknowledged the consequences of his actions and told the court he simply could not be present every day and would accept the default judgment. Nevertheless, Mr. Martin confirmed he would make himself available to testify if needed.

During this hearing, counsel for the IOMC also informed the court that it had received untimely deposition designations from Appellant that morning that were two weeks late.[6]

Following opening statements on June 26, 2018, the parties discussed the IOMC's outstanding motions *in limine* to preclude expert testimony and admission of the prospect manual and related materials. Appellant alleged the proffered evidence was necessary to prove the local chapter members were acting as agents on behalf of the IOMC at the time of the fight. Appellant further insisted the issue of agency was a jury question, and the trial court was bound by Judge Carpenter's reasoning in her order denying the IOMC's summary judgment motion. In response, the court stated:

> I have to hear what happened in that bar. I have to hear that. I have read it. I know what you're alleging. And I think [that] Judge Carpenter addressed the *allegata* as

---

[6] As discussed ***infra***, the court revisited this issue later in the proceedings.

opposed to the *probata*. And that's what I'm looking for, is the *probata*. And if I don't hear that, then your case fails. And I'm waiting to hear that before I can rule on the other things. That's why I didn't rule on it…

(N.T. Trial, 6/26/18, at 84; R.R. at 2117a). Thus, the court deferred ruling on the outstanding motions *in limine* pending the presentation of Appellant's case.

The issue of Appellant's proposed expert testimony came up again the next day. At that juncture, the court said it was still unsure if it would permit Mr. Lubesky to testify. The court explained that if Appellant could establish a predicate for agency, the court would consider it. But, the court determined it would not allow Mr. Lubesky to come in and read the by-laws when Mr. Lubesky was not a party to the bar fight. Specifically, the court said Mr. Lubesky's testimony that the local chapter members were acting on behalf of the IOMC that night was speculation. The court indicated it could not send matters to the jury that are too speculative. The court further noted that Mr. Lubesky's proposed expert report was "inflammatory." Nevertheless, the court reiterated that it would remain open about the admission of Mr. Lubesky's testimony depending on the other evidence Appellant introduced. (N.T. Trial, 6/27/18, at 248-60; R.R. at 2413a-2425a).

Appellant introduced seven witnesses in her case-in-chief to show the details of Decedent's death and the consequences caused by her loss. Appellant first called Decedent's fiancé, Mr. Groff, to testify to his personal history with the local chapter members and the sequence of events that led

to the fight.

Mr. Groff explained that some of the local chapter members of the IOMC held animosity toward him because Mr. Groff had previously refused to help them start the local chapter of the club. Mr. Groff also testified that his ex-wife had an affair with a former member of the local chapter (who had since moved to another chapter of the IOMC), but Mr. Groff maintained the affair had nothing to do with why the bar fight started.

On the night in question, Mr. Groff and Decedent went to Anna's Bar-B-Q Pit for dinner with two friends. Upon entering the bar, Mr. Groff recognized several members of the local chapter. Specifically, Mr. Groff identified Wayne Ritchie, Douglas Gottschall, and Mr. Martin. Douglas Gottschall's wife, Laree Gotschall, a member of the females-only Iron Maidens club, was also with their group. Mr. Groff said the local chapter members noticed him immediately and began staring at Mr. Groff and Decedent.

About a half hour after their arrival at the bar, Mr. Groff and Decedent decided to leave to avoid any confrontation, when Mr. Ritchie yelled something insulting at Decedent. Decedent yelled back. As Mr. Groff started walking towards Decedent, Mr. Gottschall's wife stopped him and began rubbing Mr. Groff's chest. Decedent and Mrs. Gottschall started to argue, and Mrs. Gottschall threw a pitcher of ice at Decedent. Mr. Gottschall then punched Decedent in her forehead with a closed fist. Mr. Groff grabbed Mr. Gottschall, and Mr. Martin jumped in to attack Mr. Groff. While the men were tussling,

Mr. Groff observed Decedent lying on the ground of the parking lot bleeding. Mr. Groff did not observe how Decedent was injured. Following Mr. Groff's testimony, the court adjourned for the day.

The next day, Appellant called Dr. Wayne Ross, a forensic pathologist, to testify about the cause of Decedent's death. Dr. Ross explained that a moving vehicle had passed over Decedent's body, and the muffler or other materials underneath the car had injured Decedent's head during impact. Dr. Ross also explained that Decedent would have been conscious for several minutes prior to her death.

Appellant also called Chad Numbers, a bar patron who witnessed the fight. Mr. Numbers testified that he noticed three or four local chapter members of the IOMC in the bar that night. Mr. Numbers recognized the men as belonging to the local chapter because they were wearing certain vests with patches. When Mr. Martin was attacking Mr. Groff, Mr. Numbers saw Decedent try to pull Mr. Martin away. Mr. Martin pushed Decedent away two times. The third time Decedent tried to pull Mr. Martin away from Mr. Groff, Mr. Martin shoved or punched Decedent such that she flew backwards and hit a vehicle exiting the parking lot, which ran over her. The fight stopped once the participants realized Decedent was badly injured.

Following Mr. Numbers' testimony, the court decided it would not permit Mr. Lubesky to testify as Appellant's expert. The court said it had re-read Mr. Lubesky's proposed expert report and decided Mr. Lubesky had nothing

relevant to offer. Appellant then asked if Mr. Lubesky could at least testify regarding under what circumstances the IOMC awards black skull beads to its members.[7] Appellant said Mr. Gottschall had testified in his deposition that he and Mr. Martin were awarded black skull beads after the fight. Although Mr. Gottschall stated the black skull beads were a form of discipline and that a member does not ever want to receive a black skull bead, Appellant argued that Mr. Lubesky would explain that black skull beads were actually a reward given to members for defending the IOMC. In essence, Appellant claimed the IOMC ratified Mr. Martin and Mr. Gottschall's conduct by rewarding them after the bar fight with the beads.

In response to Appellant's arguments, the court asked if Appellant would be calling Mr. Gottschall to testify. Appellant's counsel said Appellant wanted to use Mr. Gottschall's deposition testimony instead. The court explained Appellant could not "just read in the evidence" unless Mr. Gottschall was unavailable as a witness. (N.T. Trial, 6/28/18, at 134-35; R.R. at 2598a-99a). The court also said Mr. Gottschall's deposition testimony regarding the black skull beads was too confusing to be admissible, where Mr. Gottschall had identified the beads as a form of discipline, not a reward. (*Id.* at 137-38; R.R. at 2601a-2602a). The court further commented that Mr. Lubesky's

_____

[7] Appellant also said Mr. Lubesky's testimony was necessary to authenticate the IOMC's by-laws, prospect manual, and other corporate documents Appellant sought to admit.

- 10 -

proffered expert report was "one of the worst expert reports" the court had ever read. (**Id.** at 142, 144; R.R. at 2606a, 2608a). The court added that Mr. Lubesky's report contained too much inflammatory information and would overwhelm the jury. For all of those reasons, the court ruled Mr. Lubesky's expert testimony was inadmissible.

After the court's ruling, Appellant asked if Mr. Lubesky could testify as a fact witness instead of an expert. The court declined Appellant's request, explaining a sequestration order had been in effect throughout the trial so far, and Appellant did not sequester Mr. Lubesky. Thus, the court would not permit Mr. Lubesky to testify as a fact witness.

Appellant also called Decedent's mother, daughter, and son to testify regarding their personal losses suffered as a result of Decedent's death. Appellant called an economist, David Hopkins, as an expert witness to testify about Decedent's projected earnings had she lived.

On June 29, 2018, the issue of Appellant's untimely deposition designations came up again. Appellant sought to submit deposition designations of Mr. Crouse and Mr. Ward, officers of the IOMC. At that point, the court reiterated that it would not admit **any** deposition transcripts because they were submitted out of time. The court stated: "You know, I don't send out pre-trial orders just because I like it. I send out pre-trial orders expecting you to follow them to the letter. And when you don't[,] you're hoisted on your own petard. So that's the way I see the world." (N.T. Trial, 6/29/18, at 5-6;

- 11 -

R.R. at 2680a-81a).

Later that day, Appellant entered onto the record an offer of proof about what Mr. Lubesky would have testified to if the court had permitted his testimony. Specifically, Mr. Lubesky would have offered testimony about the IOMC's by-laws, prospect manual, and the Sergeant-At-Arms'[8] duties and responsibilities. Appellant conceded that without testimony from Mr. Lubesky or any of the IOMC's officers to authenticate the corporate documents, Appellant was unable to make her case against the IOMC.

Appellant asked the court to reconsider its rulings once more. The court agreed it would review Appellant's proffered evidence once more, stating: "I came in here [with a] clean slate, didn't know anything about the case except what I read in your writing. But, you know, I have made some decisions, and some I may stick by, I would assume most of them I'll stick by, but I will give you the—I'll indulge you…" (N.T. Trial, 6/29/18, at 74; R.R. at 2749a).

After a break, the court explained it had reviewed Appellant's proffered evidence concerning the IOMC's liability again. The court reiterated that it had excluded Mr. Gottschall's deposition testimony because Appellant's deposition designations were untimely. Additionally, the court remarked that Mr. Gottschall states in his deposition that nobody wants a black skull bead, and he and Mr. Martin got tattoos of the black skulls as a reminder not to get

_____

[8] Mr. Martin was the Sergeant-At-Arms for the local chapter.

- 12 -

into similar altercations again.

Mr. Gottschall also said in his deposition that he received the black skull bead from the local chapter president, not anyone from the IOMC. So, the court repeated that it would be too confusing for the jury to sort out the relevance, if any, of the black skull beads where it was unclear whether they were a disciplinary measure or a reward. Because Mr. Gottschall's deposition testimony was designated in an untimely fashion, and because the deposition testimony was contradictory and confusing, the court said it was not admissible. (*Id.* at 89, 101; R.R. at 2764a, 2776a). The court indicated Appellant could still call Mr. Gottschall as a live witness, but Appellant declined to do so.

The IOMC then moved for a compulsory non-suit, which the court granted. Appellant rested her case and the jury returned a verdict on July 2, 2018, against Mr. Martin, Mr. Gottschall, and Mrs. Gottschall.[9] The jury found Mr. Martin 50% liable for Decedent's death, and Mr. and Mrs. Gottschall each 25% liable. The jury awarded Appellant a total of $9,700,000.00, which included punitive damages.

Appellant timely filed a post-trial motion to remove the non-suit on July 9, 2018, which the court denied on October 9, 2018. Appellant also filed post-trial motions for delay damages and to mold the verdict, which the court

---

[9] Although Mr. and Mrs. Gottschall had settled with Appellant prior to trial, the court agreed they could remain on the verdict sheet.

granted. On November 9, 2018, prior to entry of final judgment, Appellant filed a premature notice of appeal. Appellant filed a *praecipe* for entry of final judgment on the verdict on November 16, 2018. Appellant subsequently filed an amended notice of appeal on November 21, 2018, from entry of final judgment.[10] On November 28, 2018, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant timely filed a Rule 1925(b) statement on December 14, 2018.

Appellant raises three issues on appeal:

> Did the trial court err as a matter of law, or otherwise abuse its discretion, when it refused to admit any testimony or other evidence that would have established that [the IOMC] was responsible for the death of [Decedent] when a judge of coordinate jurisdiction had previously held that this very same evidence provided the factual basis for the denial of [the IOMC's] Motion for Summary Judgment?
>
> Did the trial court err as a matter of law, or otherwise abuse its discretion, when it refused to admit any testimony or other evidence that would have established that [the IOMC] was responsible for the death of [Decedent], either directly through its policies or vicariously through the action of its members?
>
> Did the trial court err as a matter of law, or otherwise abuse

---

[10] "[A]n order denying post-trial motions is not appealable until the order is reduced to a judgment." **Parker v. Freilich**, 803 A.2d 738, 741 n.2 (Pa.Super. 2002), *appeal denied*, 573 Pa. 659, 820 A.2d 162 (2003). Nevertheless, "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." Pa.R.A.P. 905(a). Thus, notwithstanding Appellant's amended notice of appeal, Appellant's original notice of appeal relates forward to the date judgment was entered on the verdict, and there are no jurisdictional impediments to our review.

its discretion, when it refused to remove the Compulsory
Non-suit and order a New Trial?

(Appellant's Brief at 3) (re-ordered to follow chronology of argument sections as presented in brief).[11]

In her first issue, Appellant argues the court violated the coordinate jurisdiction rule when it improperly allowed the IOMC to re-litigate matters that had already been adjudicated in the IOMC's unsuccessful summary judgment motion. Appellant asserts Judge Carpenter's order denying summary judgment made clear the trial was to focus on the level of control the IOMC exerted over its local chapters and members. Appellant maintains the trial court erroneously decided the IOMC's exercise of control was somehow irrelevant and refused to admit any evidence that would have established facts necessary to prove the IOMC's liability. Appellant emphasizes the trial court lacked authority to overrule Judge Carpenter's decision that Appellant's agency claim must be submitted to the jury. Appellant concedes the procedural posture of the case had changed by the time of trial. Nevertheless, Appellant insists the court precluded her from

_____

[11] We note with disapproval that Appellant's statement of the case is replete with argument, in contravention of our rules of appellate procedure. *See* Pa.R.A.P. 2117(b) (titled: "All argument to be excluded"; stating: "The statement of the case shall not contain any argument. It is the responsibility of appellant to present in the statement of the case a balanced presentation of the history of the proceedings and the respective contentions of the parties").

presenting her case against the IOMC because the trial court refused to admit evidence that Judge Carpenter had previously decided would be the focus of trial. Appellant concludes the trial court violated the coordinate jurisdiction rule, and this Court must remand for a new trial.[12] We disagree.

The coordinate jurisdiction rule "commands that upon transfer of a matter between trial judges of coordinate jurisdiction, a transferee trial judge may not alter resolution of a legal question previously decided by a transferor trial judge." *Zane v. Friends Hosp.*, 575 Pa. 236, 243, 836 A.2d 25, 29 (2003). Simply put, "judges of coordinate jurisdiction should not overrule each other's decisions." *Id.* This rule is "premised on the sound jurisprudential policy of fostering finality in pre-trial proceedings, thereby promoting judicial economy and efficiency." *Riccio v. American Republic Ins. Co.*, 550 Pa. 254, 260, 705 A.2d 422, 425 (1997).

"When determining whether the coordinate jurisdiction rule applies, the court is not guided by whether an opinion was issued in support of the initial ruling. Instead, this Court looks to where the rulings occurred in the context of the procedural posture of the case." *Id.* at 261, 705 A.2d at 425 (internal

---

[12] Appellant also suggests the trial court paid no deference to the prior order disqualifying Mr. Whitfield as counsel. Appellant highlights that Mr. Whitfield was disqualified as representing the IOMC because he was a necessary witness, but the trial court refused to let him testify. This particular claim is not well developed in the argument section of Appellant's brief, so we deem it waived. *See Bombar v. West American Ins. Co.*, 932 A.2d 78 (Pa.Super. 2007) (explaining undeveloped or underdeveloped claims are waived on appeal).

citation omitted).  Significantly:

> Where the motions differ in kind, as preliminary objections differ from motions for judgment on the pleadings, which differ from motions for summary judgment, a judge ruling on a later motion is not precluded from granting relief although another judge has denied an earlier motion. However, a later motion should not be entertained or granted when a motion of the same kind has previously been denied, unless intervening changes in the facts or the law clearly warrant a new look at the question.

*Id.* (quoting *Goldey v. Trustees of the Univ. of Pennsylvania*, 544 Pa. 150, 155-56, 675 A.2d 264, 267 (1996)).  *See also Parker, supra* (holding trial court did not violate coordinate jurisdiction rule by granting appellees' motion for nonsuit on issue of ostensible agency; motions for summary judgment and motions for nonsuit are not motions of same kind; at time court granted motion for nonsuit, trial judge had before him evidence presented by appellant in her case-in-chief; by contrast, when prior judge denied summary judgment motion, trial had not begun and appellant had not presented her case-in-chief; thus, appellant's presentation of her case-in-chief constituted intervening change in facts that warranted second consideration of issue of ostensible agency through motion for nonsuit).

Instantly, the trial court addressed Appellant's argument concerning the coordinate jurisdiction rule as follows:

> Here, Appellant's case significantly changed at trial.  This [c]ourt had an opportunity to look closely at the evidence Appellant sought to put in front of the jury about the [IOMC's] corporate liability.  This [c]ourt also had an opportunity to hear testimony from Appellant's witnesses about the incident.  After considering all of this information

> and oral arguments from counsel, this [c]ourt granted [the IOMC's] motion to Quash Notices to Attend, and [the IOMC's] motion to Preclude Testimony of Ray Lubesky…. Having determined that Appellant had no plausible path forward with respect to the [IOMC's] corporate liability, this [c]ourt granted the motion for compulsory nonsuit with regard to that issue.  This issue is meritless.

(Trial Court Opinion, filed April 8, 2019, at 15).  Additionally, the court stated: "If Appellant's argument were taken seriously, then many trial courts in the [C]ommonwealth could not grant a motion for compulsory nonsuit. Appellant's argument seeks to render this very important procedural stage of a trial, completely moot." (***Id.***)

We agree with the trial court's analysis.  Although Judge Carpenter denied the IOMC's motion for summary judgment and anticipated that the question of agency would be for the jury to resolve, Judge Carpenter was not asked to decide the admissibility of the evidence offered at trial.  The trial court considered the evidence Appellant sought to admit to establish her claim against the IOMC, and precluded evidence that was irrelevant, too speculative, would cause jury confusion, or was otherwise inappropriate.  Thus, at the time Appellant presented her case-in-chief, the procedural landscape of the case had changed significantly from the summary judgment stage.[13]  Under these

---

[13] With respect to the trial court's references to the variance between the *allegata* and *probata*, ***see*** N.T. Trial, 6/26/18, at 84; R.R. at 2117a, "[t]he first and fundamental rule in the production of evidence is that the evidence offered must correspond with what is alleged in the pleadings, as the basis of the action or of the defense; the *allegata* and *probata* must agree." ***Higgins Lumber Co. v. Marucca***, 48 A.2d 48, 49 (Pa.Super. 1946).

circumstances, the trial court was free to grant the IOMC's motion for compulsory nonsuit, without running afoul the coordinate jurisdiction rule. *See Riccio, supra*; *Parker, supra*.

In her second and third issues combined, Appellant argues the IOMC's relationship to Mr. Martin and the other local chapter members was a question of fact that should have been submitted to the jury. Appellant asserts the trial court improperly decided as a matter of law that the bar fight had nothing to do with the IOMC and was based merely on personal animus. Appellant maintains the trial court's reasoning in this case was circular—the court would not admit evidence connecting the IOMC to the fight because no evidence had been introduced connecting the fight to the IOMC. Appellant claims Mr. Groff's testimony could not have established the requisite agency relationship between the IOMC and the local chapter members because Mr. Groff was not a member of the club and would not have been privy to its inner-workings. Appellant highlights Mr. Martin's deposition testimony that on the night in question, Mr. Martin acted in his capacity as the local chapter's Sergeant-At-Arms. Appellant complains the court improperly precluded her from introducing Mr. Martin's deposition testimony.[14]

_____

[14] Appellant also challenges the court's exclusion of evidence that the IOMC paid for Mr. Martin's legal counsel. Appellant concedes this piece of evidence alone does not establish agency, but she claims it is one piece of evidence that, when taken with other evidence, could have supported her theory of liability against the IOMC. Initially, Appellant mentions this particular claim

Appellant further argues the court improperly excluded Appellant's proffered expert testimony from Mr. Lubesky. Appellant avers that Mr. Lubesky was one of the founders of the IOMC and the past president, and he was prepared to testify that the IOMC controls the local chapters. Appellant insists the court's exclusion of evidence concerning the black skull beads was also improper. Appellant contends Mr. Gottschall stated in his deposition testimony that he received the black skull bead for defending the club. Appellant insists the court precluded evidence of the black skull beads without allowing Appellant an opportunity to explore the issue with Mr. Martin or Mr. Gottschall. Appellant emphasizes that evidence regarding the black skull beads would have showed the IOMC ratified Mr. Martin and Mr. Gottschall's conduct on the night of the fight. Appellant also submits the court improperly required her to offer Mr. Martin and Mr. Gottschall as live witnesses, even though the rules of civil procedure permit a plaintiff to use a party's deposition testimony for any purpose at trial.

Additionally, Appellant argues the court refused to admit corporate documents of the IOMC that would have showed the local chapters do not operate independently of the IOMC. Appellant claims she was prepared to

_____

only in a footnote, *see* Appellant's Brief at 41, n.51, and it is underdeveloped, so it is waived. ***See Parker, supra***. Further, although the IOMC might have represented Mr. Martin at some time or paid for his legal counsel, the record makes clear that when Mr. Martin appeared in court prepared to accept the default judgment due to his inability to appear for court each day, he was unrepresented.

offer evidence that Mr. Martin was an officer within the national chain of command and bound by the corporate documents. Yet, Appellant maintains the court refused to allow the IOMC's corporate officers to appear and testify about the relevant corporate documents that would have established the agency relationship between the IOMC and the local chapter members involved in the fight.[15] Appellant concludes the court's "wholesale preclusion" of all material evidence necessary to establish Appellant's theory of liability against the IOMC was improper, and this Court should vacate the nonsuit and remand for a new trial limited to the IOMC's liability. We disagree.

This Court's standard of review regarding the propriety of a trial court's grant of a compulsory non-suit is well-settled:

> A motion for compulsory non-suit allows a defendant to test the sufficiency of a [plaintiff's] evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the

_____

[15] Appellant further challenges the trial court's alternative reasoning that, even if Appellant had established that Mr. Martin and Mr. Gottschall were agents of the IOMC, Appellant failed to show they acted in the course and scope of their membership on the night in question due to their use of excessive force. Appellant submits the law pertaining to an employee who uses excessive force outside the scope of his employment does not apply here because the IOMC is an outlaw motorcycle gang that contemplates fighting as part of its by-laws. For the reasons discussed *infra*, we do not have to address this particular argument.

- 21 -

> submission of the case to the jury. When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered.
>
> ***Poleri v. Salkind***, [683 A.2d 649, 653 (Pa.Super. 1996)], *appeal denied*, 548 Pa. 672, 698 A.2d 595 (1997). "A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff." ***Id.*** …

***Hong v. Pelagatti***, 765 A.2d 1117, 1121 (Pa.Super. 2000). "An order denying a motion to remove a compulsory nonsuit will be reversed on appeal only for an abuse of discretion or error of law." ***Alfonsi v. Huntington Hosp., Inc.***, 798 A.2d 216, 218 (Pa.Super. 2002) (*en banc*).

Likewise, "[q]uestions regarding the admission or exclusion of evidence are subject to an abuse of discretion standard of review." ***Braun v. Target Corp.***, 983 A.2d 752, 760 (Pa.Super. 2009), *appeal denied*, 604 Pa. 701, 987 A.2d 158 (2009). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." ***Geise v. Nationwide Life and Annuity Co. of America***, 939 A.2d 409, 417 (Pa.Super. 2007) (internal citation omitted).

> Pennsylvania trial judges enjoy broad discretion regarding the admissibility of potentially misleading and confusing evidence. Relevance is a threshold consideration in determining the admissibility of evidence. A trial court may, however, properly exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice.

> Generally[,] for the purposes of this evidentiary rule, prejudice means an undue tendency to suggest a decision on an improper basis. The erroneous admission of harmful or prejudicial evidence constitutes reversible error.

*Braun, supra* (quoting *Whyte v. Robinson*, 617 A.2d 380, 383 (Pa.Super. 1992)). *See also* Pa.R.E. 401 (defining relevant evidence); Pa.R.E. 403 (stating: "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). The trial court is responsible for balancing the "alleged prejudicial effect of the evidence against its probative value and it is not for an appellate court to usurp that function." *Carlini v. Glenn O. Hawbaker, Inc.*, 219 A.3d 629, 639 (Pa.Super. 2019) (internal citation omitted).

Similarly, "[a]dmissibility of expert testimony is left to the sound discretion of the trial court, and as such, this Court will not reverse the trial court's decision absent an abuse of discretion." *Snizavich v. Rohm and Haas Company*, 83 A.3d 191, 194 (Pa.Super. 2013), *appeal denied*, 626 Pa. 691, 96 A.3d 1029 (2014). "[E]xpert testimony must be based on more than mere personal belief, and must be supported by reference to facts, testimony or empirical data." *Id.* at 195 (internal citations and quotation marks omitted). *See also* Pa.R.E. 702 (defining expert testimony).

To prove a negligence claim, "a plaintiff may proceed against a defendant on theories of direct and vicarious liability, asserted either

concomitantly or alternatively." ***Sokolsky v. Eidelman***, 93 A.3d 858, 864

(Pa.Super. 2014) (quoting ***Scampone v. Highland Park Care Ctr., LLC***, 618

Pa. 363, 388, 57 A.3d 582, 597 (2012)).

> Liability for negligent injury is direct when the plaintiff seeks to hold the defendant responsible for harm the defendant caused by the breach of duty owing directly to the plaintiff. By comparison, vicarious liability is a policy based allocation of risk. Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that [it] possibly can to prevent it. Once the requisite relationship (*i.e.*, employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the availability to pay.

***Sokolsky, supra*** (quoting ***Scampone, supra*** at 388-89, 57 A.3d at 597).

An agency relationship may arise "whenever a person authorizes

another expressly or by implication to act as his agent." ***Garbish v. Malvern***

***Fed. Sav. and Loan Ass'n***, 517 A.2d 547, 553 (Pa.Super. 1986). An agency

relationship may be created by:

> (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel. Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters. Implied authority exists in situations where the agent's actions are 'proper, usual and necessary' to carry out express agency. Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal.

> The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. The creation of an agency relationship requires no special formalities. … The party asserting the existence of an agency relationship bears the burden of proving it by a fair preponderance of the evidence. In establishing agency, one need not furnish direct proof of specific authority, provided it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed.

*V-Tech Services, Inc. v. Street*, 72 A.3d 270, 278-79 (Pa.Super. 2013) (quoting *Walton v. Johnson*, 66 A.3d 782, 786 (Pa.Super. 2018)).

In general, "the existence of an agency relationship is a question of fact." *McIlwain v. Saber Healthcare Group, Inc., LLC*, 208 A.3d 478, 485 (Pa.Super. 2019). "Where the facts giving rise to the relationship are not in dispute, however, the question is one which is properly decided by the court." *Consolidated Rail Corp. v. ACE Property & Casualty Ins. Co.*, 182 A.3d 1011, 1027 (Pa.Super. 2018).

Instantly, although Appellant classifies the trial court's actions as a "wholesale preclusion" of all material evidence related to her claims against the IOMC, Appellant ignores the court's particular rulings concerning each piece of evidence Appellant sought to admit. Essentially, Appellant challenges the court's separate rulings excluding: (1) expert testimony from Mr. Lubesky; (2) deposition testimony from Mr. Martin, Mr. Gottschall, and other corporate witnesses; and (3) the IOMC's by-laws, prospect manual, and other corporate

documents.

With respect to Mr. Lubesky, the court precluded his testimony because: "Mr. Lubesky was not a witness to the fight. Mr. Lubesky's expert report consisted of nothing more than rank speculation about what he thinks went on in the subjective minds of [the local chapter members] on the night of the incident and about a so called 'outlaw culture' that indoctrinated these individuals. Such speculative testimony is not permissible at trial." (Trial Court Opinion at 32). The court further described Mr. Lubesky's proffered expert report as "nothing more than an incendiary, rambling, and largely irrelevant stream of consciousness that provided no insight into the events of the night [Decedent] was killed. Even if the court allowed Mr. Lubesky to testify, this [c]ourt would have stricken nearly all of his report due to the irrelevant and inflammatory nature of its contents." (*Id.* at 22 n.11).

Here, the court decided Mr. Lubesky's proffered testimony was nothing more than his personal opinion, which was not properly within the realm of expert testimony. *See Snizavich, supra*; Pa.R.E. 702. Additionally, the court weighed the probative value of Mr. Lubesky's proffered testimony against its prejudicial effect and decided the prejudicial effect was too great to permit such testimony. We see no reason to disrupt the court's evidentiary

ruling concerning Mr. Lubesky's proffered expert testimony.[16]  *See Carlini, supra*; *Bruan, supra*; Pa.R.E. 403.

Regarding Appellant's attempt to introduce deposition testimony from various witnesses at trial, the court initially stated it would not permit any deposition testimony due to Appellant's failure to designate the deposition testimony in a timely fashion.  (*See* N.T. Trial, 6/29/18, at 5-6; R.R. at 2680a-81a); (N.T. Trial, 6/29/18, at 89; 101; R.R. at 2764a; 2776a).  In addition to its untimeliness, the court indicated that Mr. Gottschall's deposition testimony pertaining to receipt of the black skull beads was too confusing to go to the jury.  (*See* N.T. Trial, 6/28/18, at 134-35; R.R. at 2598a-99a); (N.T. Trial, 6/29/18, at 89, 101; R.R. at 2764a, 2776a).  The court indicated Appellant could still call Mr. Gottschall as a live witness to discuss the black skull beads, but Appellant declined to do so.  Under these circumstances, we see no reason to disrupt the court's exclusion of deposition testimony from various

_____

[16] Additionally, with respect to Appellant's claim at trial that the court should have permitted Mr. Lubesky to testify as a fact witness, even if his expert opinion was inadmissible, the record supports the court's denial of Appellant's request where Mr. Lubesky was present throughout trial notwithstanding the court's sequestration order concerning the other fact witnesses.  In her reply brief, Appellant argues the fact that Mr. Lubesky was present for some points of trial should not have justified his exclusion.  As Appellant cites no law in support of this statement, we deem this particular assertion waived.  *See George v. Ellis*, 911 A.2d 121, 126 (Pa.Super. 2006), *appeal denied*, 592 Pa. 767, 923 A.2d 1174 (2007) (explaining well-settled principle that failure to cite any supporting authority constitutes waiver of issues on appeal).

witnesses.[17]  *See Braun, supra*; Pa.R.E. 403*.*

Concerning the court's exclusion of the corporate documents, Appellant sought to introduce the by-laws, prospect manual, and other related documents through live testimony from the IOMC's officers (before the court quashed Appellant's notices to attend), through deposition testimony from the IOMC's officers (after the court quashed Appellant's notices to attend), or through Mr. Lubesky.  *See generally PHH Mortg. Corp. v. Powell*, 100 A.3d 611, 619 (Pa.Super. 2014) (explaining that to authenticate relevant evidence, parties should lay foundation to show evidence is fair and accurate representation of what it is purported to depict, including testimony from witness with knowledge of what evidence is proclaimed to be); Pa.R.E. 901(a) (discussing authenticating or identifying evidence).  We have already decided the court did not abuse its discretion in excluding Mr. Lubesky's testimony or the untimely depositions.

Turning to the court's quashal of the notices to attend, the IOMC filed a motion to quash the notices on June 14, 2018, asserting they failed to comply with the relevant rules of civil procedure because they were entirely vague, Appellant did not explain what relevant testimony the witnesses had to offer,

_____

[17] Because the court properly exercised its discretion to exclude the deposition testimony due to its untimeliness and/or confusing nature, we do not have to consider Appellant's claim that the court erred by requiring her to offer live testimony over deposition testimony.  *See generally In re Estate of Rood*, 121 A.3d 1104, 1105 n.1 (Pa.Super. 2015) (stating this Court may uphold trial court's decision if there is any proper basis for result reached).

and Appellant did not allege why these witnesses' deposition testimonies could not be used instead of live testimony given their varying geographic locations.

On June 25, 2018, the court granted the motion to quash. Nevertheless, the court handwrote into the order: "If the testimony at trial shows a basis for calling these witnesses this court will reconsider this ruling and may permit [Appellant] to call one or more of these potential witnesses." (Order Granting Motion to Quash Notices to Attend, 6/25/18, at 1; R.R. at 1941a).

In her reply brief, Appellant contends the court's quashal of her notices to attend had nothing to do with noncompliance with the rules of civil procedure. Although the court did not specify the basis for its order granting the IOMC's motion to quash, we disagree with Appellant's position that the court's order had nothing to do with granting relief on the grounds specifically asserted. The fact that the court handwrote onto its order that it might reconsider its ruling and permit one or more of the potential witnesses to testify depending on the evidence presented at trial does not mean the court did not grant the IOMC's motion on the grounds expressly asserted.

In any event, the court noted throughout trial that the corporate documents were inflammatory. (**See** N.T. Trial, 6/28/18, at 144; R.R. at 2608a) (court stated: "There's just too much inflammatory information. I think it overwhelms. You know now we have…a dead woman with all this inflammatory information…"). **See also** (Trial Court Opinion at 25) (stating: "At trial, [A]ppellant sought to introduce a number of corporate documents

from the [IOMC] that do not cast the club in a positive light. The corporate documents contain lurid material and pugilistic language").

Consequently, before the trial court would permit introduction of any of the corporate documents or testimony from the corporate officers discussing those documents, the trial court required Appellant to set forth some evidence that the local chapter members were acting on behalf of the IOMC on the night in question. The trial court suggested Appellant offer Mr. Martin or Mr. Gottschall to establish this predicate, but Appellant declined to do so.[18] In the absence of such evidence, the court essentially decided the prejudicial effect of the corporate documents and related testimony outweighed its probative value. **See Braun, supra**; Pa.R.E. 403. **See also** (Trial Court Opinion at 27) (conceding that many statements in corporate documents are unbecoming of civilized individuals; nevertheless, court could not allow Appellant to twist and contort facts of case so that she could punish motorcycle clubs). We cannot say the court's evidentiary ruling in this respect constituted an abuse of

_____

[18] Instead, as previously discussed, Appellant sought to offer only Mr. Martin and Mr. Gottschall's deposition testimony. We have already decided the court did not abuse its discretion in precluding the deposition testimony. Additionally, Appellant did not attempt to call Mr. Whitfield, who was present in court for at least part of trial. Although Appellant represented to the court at one point that Mr. Whitfield had "hightailed it out of here" when Appellant suggested calling him as a witness (**see** N.T. Trial, 6/28/18, at 129; R.R. at 2593a), nothing on the record supports that statement. Given Appellant's prior representation in her motion to disqualify Mr. Whitfield as counsel that he was a "necessary witness," it is curious that Appellant did not ask the court if she could present him as a live witness.

discretion.[19] *See Braun, supra*; *Geise, supra*. Because we see no abuse of discretion concerning the court's various evidentiary rulings, we agree with the trial court that Appellant was unable to establish a cause of action against the IOMC, and the court's denial of Appellant's motion to remove the nonsuit was proper.[20] *See Alfonsi, supra*; *Hong, supra*. Accordingly, we affirm.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/20

---

[19] Based on our disposition that the court did not abuse its discretion by excluding Appellant's proffered evidence, we do not have to consider Appellant's argument concerning the trial court's statement that even if Appellant had established a valid agency claim, Mr. Martin's role in the fight exceeded the scope of his membership duties.

[20] To the extent Appellant argues some of the trial court's rulings were pretextual because the court had already made up its mind that the case was nothing more than a bar fight, the record belies Appellant's claim. The record shows the court repeatedly revisited its rulings, and reviewed the proffered materials multiple times throughout trial to ensure the court understood Appellant's arguments and the evidence she sought to introduce. (*See* N.T. Trial, 6/29/18, at 74; R.R. at 2749a).